724 F.Supp. 88 (1989)
UNITED STATES of America for the Use and Benefit of CORTOLANO & BARONE, INC., Plaintiff,
v.
MORANO CONSTRUCTION CORPORATION, f/k/a Morano Excavating, Inc., Fireman's Fund Insurance Company, and the American Insurance Company, Defendants.
MORANO CONSTRUCTION CORPORATION, f/k/a Morano Excavating, Inc., Defendant and Counterclaimant,
v.
INTERNATIONAL FIDELITY INSURANCE COMPANY, Counterclaim Defendant.
No. 87 Civ. 4920 (RWS).
United States District Court, S.D. New York.
September 21, 1989.
Melvin J. Kalish, New York City, for plaintiff and counterclaim defendant.
Berman, Paley, Goldstein & Berman, New York City, for defendants; Howard Burger, of counsel.
SWEET, District Judge.
Plaintiff Cortolano & Barone, Inc. ("C & B"), a subcontractor on a United States of America project at Stewart International Airport, brought this action under the Miller Act, 40 U.S.C. § 270a et seq., against a prime contractor on the project, Morano Construction Corporation ("Morano") and its sureties who then counterclaimed against C & B and its surety. After a bench trial, judgment will be entered in accordance with the findings and conclusions set forth below granting certain of the relief C & B sought.

Prior Proceedings
C & B commenced this action by filing a complaint on July 10, 1987, which it subsequently amended. Morano filed its answer and counterclaim, an amended answer and counterclaim, and a second amended answer and counterclaims. C & B filed a reply and an amended answer of counterclaim.
Discovery was completed virtually without dispute, and the action was tried before the court on May 2 through May 8, 1989, and resumed on May 25 and 30. Testimony of five witnesses, all in the construction business, was received, as well as several hundred exhibits. Final submissions were filed on June 29, 1989.

*89 The Issues

By the skilled and experienced hands of able counsel for both sides, the court was led through the formation, performance, and termination of a substantial subcontract entered into between C & B and Morano in connection with a government construction project for Stewart International Airport. Notwithstanding the assistance given the court, to account for the issues presented is almost as difficult as to track the progress of this construction job.
The principal issues include the propriety of Morano's termination of the subcontract it had with C & B, whether a subsequent subcontract was entered into or partially performed, and what are the financial consequences of the parties' acts during their relationship from the spring of 1986 to the spring of 1987 against the background of these issues.
As set forth in the findings and conclusions found below, Morano was not justified in terminating the subcontract, there was no subsequent subcontract, and the balance of moneys owed favors C & B.

Findings of Fact

The Parties
C & B is a New York corporation with its principal place of business at 708 Saw Mill River Road, Ardsley, New York. It has been in business in its present form since 1983 and has performed plumbing, heating, ventilating, and mechanical contracts principally in the Westchester area. Its vice president and witness was Armando Barone, Jr. ("Barone") who is the third generation of his family to work at his trade. Barone has fourteen years experience in the type of business C & B conducts.
Morano, formerly known as Morano Excavating, Inc., is a New York corporation with its principal place of business at 18 North Astor Street, Irvington, New York. Prior to the events recounted here, Morano was involved principally in excavating and road building and had not undertaken any building construction. Its president was Michael Morano, its vice president was John Harrington ("Harrington"), and its project manager with respect to the subcontract at issue here after January 1, 1987 was Anthony J. Spinella ("Spinella").
Defendant Fireman's Fund Insurance Company ("Fireman's") is a California corporation with an office at 420 Crossways Park Drive, Woodbury, New York and is Morano's surety. Defendant The American Insurance Company ("American") is a New Jersey corporation with an office at 420 Crossways Park Drive, Woodbury, New York and is Morano's surety. Counterclaim defendant International Fidelity Insurance Company ("International") is a New Jersey corporation with its principal place of business in Newark, New Jersey and is C & B's surety. Fireman's, American, and International as sureties have each tendered their defense to their respective principals. Each surety reserves the right to assert herein any and all defenses it may have against the claims asserted against said surety.

The Contract, Its Extensions, and the Subcontract and Phase III
On October 22, 1985, Morano was awarded an over $4 million contract by the United States of America, acting through the New York Air National Guard ("NYANG") and United States Marine Corps ("USMC") for site improvement at Stewart International Airport, described as Contract # DAHA 30-85-C-0028 Site preparation Phase III (the "Contract").
The Contract between Morano and the government called for Morano to construct a water storage basin, a water booster pump house (to pump uphill, under pressure, water supplied by the local utility), two water storage tanks, a utility center containing, among other things, pumps to furnish water for domestic and emergency use throughout the military airfield, and associated process piping, fuel tank, electricity, etc. (the "Project"). Subcontracts were let for structural, electrical, and mechanical work (plumbing, pumps, process piping, fire protection, heating, ventilating, and air conditioning). The first mechanical subcontractor, Star Mechanical Corp. ("Star Mechanical"), was terminated on May 2, 1986 for non-performance.
*90 On May 27, 1986, Morano and C & B entered into a written subcontract for plumbing work, process piping work, sprinkler system work, and heating, ventilating, and air-conditioning work ("HVAC") at the Project (the "Subcontract"). The base Subcontract price was $607,000.00 which Addendum # 4 increased by $11,681.81.
The Subcontract provided, among other things, as follows:
Sub-Contractor must follow submittal schedule.
(Subcontract, at p. 4)
Extra work must be approved by the owner both in context and value as valid extra work prior to any compensation from Morano Construction Corporation.
(Subcontract, at p. 5)
THIRD: PROVISIONS OF GENERAL CONTRACT. The Subcontractor has read and is familiar with the General Contract....
(Subcontract, at p. 6)
FOURTH; PROGRESS. Time is of the essence of the Subcontractor's performance under this agreement and the Subcontractor ... shall progress the same as not to delay or interfere with the Contractor in any of its operations and shall proceed in such order and sequence as the Contractor may direct and so as to enable the Contractor to complete its work within the limits specified in the General Contract or as the same may be extended ..., it being the Subcontractor's obligation to coordinate its work with the work of the Contractor.
(Subcontract, at p. 6)
SIXTH; CANCELLATION OF CONTRACT. If the Subcontractor fails to prosecute its work in accordance with this agreement or the General Contract, the Contractor, at its option, may terminate this agreement upon 3 days written notice mailed to the Subcontractor at its above address and upon expiration of such 3 days from mailing shall have the right (1) to take possession of any materials, tools, equipment, plant appliances or other things belonging to the Subcontractor on the site of the construction which in the Contractor's opinion are essential to the prompt completion of the Subcontractor's completion to the Subcontractor.
(Subcontract, at p. 6)
Morano's Contract with the Air National Guard was dated October 21, 1985. The Contract time was 426 days from the Notice to Proceed, and the Notice to Proceed was dated October 21, 1985. The Contract completion date was thus January 1, 1987.
On December 12, 1985for reasons unrelated to this controversyNYANG extended the completion date by 30 days to January 31, 1987.
On December 19, 1986, NYANG delivered a Show Cause Notice to Morano stating: "the Government is considering terminating the contract under the provisions for default of this contract." The Notice invited a response to Michael L. Shattuck, Contracting Officer, Contracting Support Office, NYANG ("Shattuck"). Shattuck was responsible on behalf of NYANG for supervision and performance of the Contract.
Harrington responded by letter on December 23, 1986, describing Morano's efforts "to formulate a realistic progress schedule" in light of the information provided by its subcontractors. The letter continued:
One of the most important aspects of this schedule is the time frame in which erection of the water storage tank will take place. We are planning to begin erection the week of February 7, 1987.
We anticipate, weather permitting, eight (8) weeks to erect and paint the tanks after commencement. Project completion date of July 15, 1987 is therefore anticipated.
We encountered unanticipated and excusable delays arising from your engineers' failure to process and approve shop drawings and change orders in a reasonably timely manner. You should understand that we are not enumerating the various delays in this letter. Your office is aware that change orders have not been approved and shop drawings required *91 clarification. This will be forwarded to you under separate cover.
Accordingly we request an extension of time to complete this work to July 15, 1987.
Morano also responded to this threat of default on January 4 by hiring Spinella, an experienced project manager and licensed professional engineer with 25 years in construction work for the Federal Aviation Administration. His first assignment was to cope with the position NYANG had taken. In a three and one-half page letter dated January 30, 1987, Spinella detailed the work performed, the work to be performed, and the explanation for the delays. Spinella noted the engineers' failure to approve drawings and equipment, change orders, storm conditions, the difficulties in obtaining a required concrete block, and a steel strike that affected the ability of RECO Industries, Inc. ("RECO"), C & B's subcontractor, to fabricate the water storage tanks.
Through Shattuck, NYANG accepted Morano's position that the delays were "excusable" and extended the contract period thirty days by a Contract Modification postdated December 22, 1986. A second Contract Modification dated January 29, 1987 extended the contract period for another seventy-five days to April 16, 1987.
Well after Morano terminated C & B's Subcontract under the circumstances described below, on September 30, 1987 Morano sought and obtained another extension from NYANG that extended the time for performance of the Prime Contract 150 days to September 13, 1987. Morano was assessed 19 days of liquidated damages in the amount of $12,500. Substantial completion was achieved on November 5, 1987.

The Termination of the Subcontract for Phase III
When work first began on the Contract, NYANG used a Critical Path Method ("CPM") to schedule and track the work's progress. However, by August 1986 NYANG had abandoned this methodology, and no written schedules were developed on a regular basis to chart the anticipated completion dates of portions of the work and to integrate and coordinate the work of the various contractors and subcontractors. Instead, Shattuck, the Contracting Officer, held regular progress meetings with the contractors and kept minutes of the meetings prepared by Shattuck's Assistant, Staff Sergeant Brenda Siegel ("Siegel").
After the January 29, 1987 extension of the Contract deadline, Spinella turned his attention to the bi-weekly meetings Shattuck held. After and between the meetings on January 15, 20, and 27 and February 5, 10, 16 and 27, Spinella wrote letters to Barone advising him of the problems NYANG and Shattuck referred to. These included the submission of a layout for the mechanical room and the booster pump station, transition couplings for the water tanks, leaks in underground pipe lines, availability of materials for piping inside the water tanks, and the installation of a fuel tank. Barone responded in writing or orally to these letters explaining C & B's progress and position.
The crux of the problem, however, was Edward Richter ("Richter"), the subject of Michael Morano's February 12 letter to Barone. Richter was C & B's supervisor on the job. He had been a vice president of Star Mechanical, C & B's predecessor subcontractor. After Star Mechanical was terminated, Richter became C & B's project manager. The February 12 letter stated the problem in the following terms:
This is to advise you that Mr. Ed Richter is not to enter onto the job site at Stewart Airport. His co-operation on this job leaves much to be desired. His delays in submitting shop drawings, his failure to coordinate the completion of the fuel tank installation, his late delivery of the transition couplings and his discussions with the Air National Guard representatives telling them no layout drawings are necessary, leaves a bad taste in every-one's mouth. He is un-cooperative and the job has suffered as a result.
Richter also had a prior history with Shattuck, having exchanged correspondence with respect to the respective responsibilities of contractors, subcontractors, and the contract supervisor on a previous *92 project. According to Shattuck, Richter had a "unique writing style ... he was the type of gentleman that could write six pages and say one sentence worth." Although Shattuck had no recollection of dealing with Richter while he was working with Star Mechanical, it is a fair inference that he did.
Shattuck did not view the C & B personnel as well-supervised. He observed them from time to time because his trailer was near the site of their work, "which [with respect to installing pipe under this pump house] was not professional in any manner, it's very very slow, time consuming." (Tr. 423). During this period, C & B also had assigned Richter responsibilities for two other C & B projects, one in Eastchester and the other in Briarcliff Manor. Two men, Jeffrey Hogan as foreman and a mechanic constituted C & B's field force at this time.
C & B took no action with respect to Richter, and the February 16 Morano letter further focused on the problem:
We have defined the delays caused by Cortolano & Barone in previous correspondence and we won't repeat them again.
In your letter you state you have a full time representative on the job. If so, what is his name; what does he do; is he a worker or is he a supervisor? if he was on the job, why didn't RECO go to him to talk about the materials you had to have on the job site?
In your letter you also state that your goal has always been to complete your work in the most expeditious manner. If this is so, why is it that you have not yet completed the piping to the fuel tank? This tank was installed on January 16, 1987 and Morano has been prevented from backfilling the tank because of your failure to complete the piping. The National Guard has expressed their concern about cave-in and the potentially unstable condition this has created especially since the tank is next to the fire pump house building foundation.
You are therefore directed to immediately complete all work at the fuel tank so that Morano can complete its backfilling operations.
The flavor of the relationships and Richter's writing style is captured by Richter's letter of February 20 in reply, a portion of which follows:
In answer to your letter of February 18, 1987 with reference to an insulated roof thimble.
Your request is pure lunacy. Drawing UC-12 clearly indicated "N.I.C.", do you now understand this is not part of the contract.
I am not being paid to be your teacher on how to interpret mechanical drawings, and neither are we responsible to show you the proper order of building a project both of which you obviously are having difficulty with.
Notwithstanding the difficulty surrounding Richter, by the end of February the layout problem had been resolved, including an understanding that C & B would be responsible for any changes required as a result of the delay in providing the drawings.
According to Barone, no C & B personnel were on the site on March 10, 1987 because Hogan, who drove the mechanic to work, was ill. Although the minutes of the March 11 progress meeting between Morano and Shattuck, attended by others, contain no reference to the March 10 absence of C & B personnel, it is a fair inference that Shattuck was aware of it and that it provided an ignition point for the following statement, duly recorded by Siegel:
Upon lengthly [sic] discussion about the lack of progress in the pumphouse, the Contractor was advised that the Government was seriously considering a partial termination for default (mechanical work) as the Government required water service by 15 April 1987 (Contract Completion). Contractor stated they were trying their best and did not appreciate a threat of this nature. To this the Government responded it was no threat as water service is required for ongoing construction. Contractor requested a detailed list of problem areas with mechanical items. The Government responded *93 that due to work progress and lack of materialsformulation of any such list would be fruitless, further, this kind of list is the Contractor's responsibility in its entirety as the Government has no privy of contract with your subcontractor.
Spinella reported to Michael Morano and Harrington, and the next day Morano decided to terminate the Subcontract. On March 12, 1987 it sent C & B a letter to that effect. Barone sought to appeal the decision and with Richter met with Shattuck. After Richter was excused, in response to Barone's question as to "what the real problem was," Shattuck stated that "part of the problem was Mr. Richter himself." A period of uncertainty followed during which C & B sought unsuccessfully to stay on the job until March 18, 1987 when the rupture between the parties was complete. By March 23, Morano retained Centrum on a time and materials basis to complete the Subcontract.
The principal grounds for termination were cataloged by Spinella and contained in his notes made in preparation for his first deposition. There were 6 items: the fuel tank, transition couplings, the water tank, leaks in the 4" line, the mechanical layout drawings, and work in the fire pump house. Although Shattuck and Morano had complained about each of those items, under all the circumstances none provided grounds for termination. Neither Morano nor Shattuck had stated firm dates for completion with respect to any of these items, and no indication of possible termination of the Subcontract was given prior to Shattuck's March 10 statement and Morano's March 12 notice.
With respect to the particular items on which Morano relied for its termination, C & B delivered the fuel tank to the project on October 3, 1986. It was to be installed on a site in full view of the Contracting Officer. Morano's Daily Reports indicated the following:

 10/3/86 Fuel Tank Delivered to Site.
 1/13/87 Morano excavated for fuel tank.
 1/13/87 Morano poured concrete pad.
 1/14/87 Morano stripped pad.
 1/16/87 C & B installed fuel tank.

By letters of February 16, 19, and 27, Morano requested C & B to complete the pipe connections so that the excavation could be backfilled. Barone stated on February 11 the work would be started the next day and would be completed within two days. By February 27, it was not. The failure to complete the pipe connections, which according to Morano delayed the backfilling of the excavation in full view of the Contract Supervisor's office, constituted a visual reminder of the work to be performed.
After the Subcontract was terminated and after a heavy rain in April, the fuel tanks floated free of the anchor bolts which it was thus revealed, were the wrong size. According to C & B, Morano's failure to backfill the excavation caused the event. Notwithstanding the aggravation that ensued, the failure to install the fuel tank did not delay the other aspects of the job.
Morano also identified the transition couplings to the water tanks and the leak in the 4" water line as causes for delay in erecting the two 250,000 gallon water tanks.
Initially, NYANG's delay in approving the design submittal for the tanks and a steel strike caused the delays in installation. Spinella described these delays when he sought and obtained an extension of the Contract early in January 1987. NYANG considered that delay "excusable."
RECO undertook to erect and paint the two large capacity water tanks the Phase III subcontract required. Before RECO could install the steel floor of the tank, a vertical underground 24" pipe made of ductile iron had to be joined to a carbonized steel pipe of the same size by means of a 24" transition coupling. The carbonized steel pipe, rather than the ductile iron pipe, was intended to "stub-up" through the steel floor of the water tank to facilitate field welding of the pipe to the steel floor and thereby achieve a watertight seal.
Morano directed C & B to purchase and install the transition couplings. Barone testified that a supplier, Vellano Brothers, had the transition couplings but that C & B was on a credit hold because it had not paid *94 its bill. In addition, C & B demanded that it be compensated for the cost of those couplings as an extra to the contract.
Morano passed the claim along to NYANG, but NYANG rejected the claim as an extra, covered by Addendum No. 4 to the Contract. Subsequently, NYANG rescinded that determination, but nonetheless found that it was the contractor's obligation to secure the pipe to the floor of the water storage tank, and therefore the use of 24" transition couplings was not compensable as an extra. Morano informed C & B of this.
As it turned out, the 24" transition couplings were delivered to the site the same day that RECO's crew arrived, and the couplings were installed the same week. Nonetheless, RECO believed it had been delayed because the transition couplings had to be installed before Morano could backfill the interior of the tanks, which had to be done before RECO could complete installing the floor of the tank. The transition couplings, however, were in fact installed on February 2 and 3, and the delay was not substantial.
Another issue concerning the water tanks arose when a leak was discovered in an underground 4" pipe running from beneath the water tank to a hot water heater in the fire pump house building. Until the leak was located, RECO could not complete the floor of the water tank because it was possible that excavation would be necessary within the ring wall foundation supporting the tank. Spinella called Barone to tell him of the leak, and on February 3, 1987, the second day that RECO was on the site, it was located outside the ring wall. However, C & B did not repair the leak, contending that it might have been caused by Morano's backfilling the excavation between the ring wall and the fire pump house building.
C & B's failure to test the pipe earlier and its failure to repair the leak promptly was considered by Morano to evidence a lack of concern, and an element in its decision to terminate C & B. However, Spinella agreed that the presence of the leak alone was not grounds for termination because leaks were commonplace. In fact, the leak did not delay the completion of the Subcontract.
Morano also claimed the delay in providing the mechanical layouts as justification for termination. At the job progress meeting with NYANG on January 12, 1987, the complaint was made that there were "still no mechanical layoutgovernment must have drawing before any work is to be accomplished. Any work done before drawing reviewed is at the contractor's own risk!" By letter dated January 15, 1987, Spinella advised Barone that Morano needed C & B's submission of the mechanical room layout as well as the layout of piping and equipment for the booster pump station, the smaller of two buildings to be constructed. He noted that those drawings were due during the early phases of the contract.
Spinella met with Richter, and with Harrington to design a layout after Richter noted that the mechanical equipment would not fit into the structure as designed by NYANG. The drawing that resulted was approved by NYANG and did not require a larger building.
As to the layout for the mechanical room in the fire pump house, C & B proceeded with its installation prior to submitting the drawings for approval. C & B told Morano that if there was anything that had to be moved because it was installed in the wrong place or in conflict with another subcontractor, C & B would move it at its own expense. This position was not satisfactory to NYANG, which required a change in the fittings in two instances. C & B made those changes without charge. The lack of drawings did not affect the completion of the Subcontract.
The principal cause for the termination was not any of the specific items about which Morano was concerned but rather NYANG's loss of confidence in Richter and C & B's failure to replace him. To keep the Contract, Morano concludedproperly in light of the events recounted above that Richter and C & B had to be replaced for reasons apart from their job performance.
*95 This finding is fortified by an entry in Spinella's diary for October 23, 1987, referring to a conversation with Morano's counsel: "No letters sent during March construct a case from end of February to time Cortolano and Barone went off the job."

The Balance Due at the Time of the Termination of Phase III
At the time of termination, certain of the C & B work on its Subcontract had been performed but not paid for. C & B's requisition to Morano for February 1987 claimed completed work valued at $438,400 plus $15,077 for 100% of the Addendum No. 4 work. Morano, however, before incorporating C & B's claimed values in its requisition to the government, cut it down to $423,200 on contract work (the largest reduction being in the chlorination system). The parties now agree that $11,681.81 is the value of the work assigned to Addendum No. 4. In addition, the parties have agreed that Morano is obligated for a bond premium of $10,926.
Morano's so-called "pencil copy" of its requisition to NYANG for February 1987 reflects changes made by NYANG before a requisition is received for payment. At the last page, it reflects that NYANG cut back the "Building Mechanical" item from Morano's claimed 78.36% complete valued at $438,837, to 75% complete valued at $420,000.00. Morano's February 1987 requisition as finally submitted to NYANG carried the "Building Mechanical" item at $420,000.00, just as the "pencil copy" reflects. When the $18,837 cut by the government is applied against C & B's $423,200 as initially determined by Morano for C & B's contract work in February, the result is $404,363. Taken together with the $11,681.81 that Morano (and NYANG) allowed on Addendum No. 4 and the bond premium of $10,926.00, the total value through February of C & B's work performed was $425,802.63.
C & B, however, did perform work in March 1987, prior to its termination by Morano for which C & B submitted no requisition. Morano submitted its requisition for $28,000 for March to the government and paid Centrum $3,811.27 for March work. Increasing that amount by 5% (its mark-up for subcontracts), and reducing the net by 5% of that amount, the amount owed C & B for March is $22,798.26 (Morano contends the correct figure is $19,137.00; C & B maintains it is $24,188.75).
Accordingly, $448,600.89 represents the value of work, labor, services, and materials C & B furnished up to the date of its termination, based on the controlling documents.
Payments Morano made to C & B for work performed, together with other payments Morano made on behalf of C & B which reduced C & B's obligations to its vendors and its subcontractors for work already performed on Phase III, are properly credited against the amount C & B earned to the date of its termination as follows:

Direct Payments from Morano to
C & B Prior to Termination $192,071.39
Payments after termination 3,725.00
Payments to C & B Subs
 Clever Brooks 22,883.00
 Miller, Proctor Nicholas 11,049.56
 G.A. Fleet[1] 2,076.00
 RECO 122,250.00
 ___________
 Total Payments $354,054.95
Total value of work through termination $448,600.89
Total payments made by Morano (354,054.95)
 ___________
Unpaid balance due C & B 94,545.94

Morano gave C & B credit for $122,250.00 on the tanks. However, that sum represents only the direct cost of the tanks, while C & B's $170,000.00 line item for the tanks was broken into three parts: (1) furnish and install tanks$122,250.00; (2) work within the tanks$26,500.00; and (3) painting the tanks$21,250.00. There are two elements for which Morano failed to give C & B credit: (1) profit or markup on the RECO subcontract and (2) the work C & B performed in the interior of the tanks.
*96 Of the $170,000.00 for the tanks, C & B is entitled to the full amount less the painting of the tanks ($26,500.00), less that portion of the interior piping not done ($3,000.00) or the total sum of $140,500.00. The difference between this sum and the $122,250.00 for which Morano gave C & B credit (the sum of $18,250.00) should be added to the calculation of the work performed by C & B through termination, making a final total for Phase III Contract work owed C & B of $112,795.94.
In addition, C & B now seeks to recover on extras for the transition couplings which were required to meet a government change order, and work in connection with Addendum # 11 (the Addendum # 4 dispute has been disposed of as indicated above). As to the transition couplings, some part of the cost was indeed attributable to the change order. However, because the Subcontract provided: "F. Extra work must be approved by the owner both in context and value as valid extra work prior to any compensation from Morano Construction Corporation," recovery is barred, no such approval from NYANG having been forth-coming. As to Addendum # 11, C & B has not established that it performed the extra work called for. Accordingly, no modification in the amount owed is in order to compensate for extra work.
As for lost profits, C & B has proposed its Subcontract price less the cost of completion estimated at $92,500.00. However, C & B's evidence of cost of completion fails to preponderate over Morano's list of work to be completed. In addition, the C & B estimate lacks the cost of overhead or supervision or, as in the case of G.A. Fleet, payments to the C & B subcontractor. In addition, no evidence has been submitted of its historical profit on this or any other job. On the issue of lost profit, therefore, C & B has failed to meet its burden of proof.

The Grant of the Subcontract for Phase IV
Phase IV was a continuation of Phase III and, just as it was logical for Morano to be interested in bidding this work (because it already was on the project), it also was also logical for C & B to be interested in bidding on the mechanical subcontract.
When the Phase IV drawings came out for bid in the summer of 1986, Barone had discussed with Michael Morano the possibility of C & B doing the mechanical work. C & B estimated the mechanical work, and on July 17, the morning of the bid, Barone called Michael Morano and gave him a C & B price of $560,000.00. Morano incorporated C & B's price and was low bidder at $4,100,000.00. NYANG issued a Notice to Proceed to Morano on September 22, 1986.
The parties met shortly after the July 17, 1986 bid opening. Michael Morano claimed that his company made a mistake and "transposed or copied down wrong" in the tabulation of the Electrical and Mechanical bids. The $588,000.00 incorrectly used bid represented C & B's bid price of $560,000.00 plus a 5% markup. Michael Morano asked Barone to "help him" and to see if he could get a better price by going to C & B's suppliers.
Barone then advised Michael Morano that C & B would reduce its $560,000.00 price to $530,000.00 Letters relating the $530,000.00 price were exchanged. Morano's October 6, 1986 letter is far more than a mere "letter of intent" in view of the last phrase which states, "in accordance with your proposal and our discussions." As evidenced by the discussions just recounted, Morano and C & B also had an oral agreement that C & B would get the Phase IV mechanical subcontract if Morano was low bidder on Phase IV.
This was not inconsistent with the practice the parties adopted with respect to the Phase III Subcontract. C & B had worked on the project from June 21, 1986 to September 24, 1986 without a written contract covering Phase III. Although the written contract is dated May 26, 1986, it was not sent by Morano to C & B until August 4, 1986 and was not executed until September 24, 1986.
In addition, C & B worked on Phase III without a performance bond from June 2, 1986 until November 6, 1986 during which time Morano paid C & B two requisitions totaling $48,830.00. Nonetheless, given *97 the nature of the parties and government contracting, both Morano and C & B knew a written subcontract would be required.
Nevertheless, at Morano's request C & B had its supplier prepare a rough sketch of the pumps required under Phase IV to see if they would fit into the building, and on October 16, 1986 and November 5, 1986, C & B requested additional sets of the contract drawings so that C & B could furnish the same to certain subcontractors.
On October 24, 1986, Morano sent C & B a post-contract addendum "for review and comment." On January 12, 1987, Morano asked C & B to advise it whether there would be a change in its Contract price because of Addendum # 1. By letter dated January 16, 1987, C & B advised Morano that they had reviewed Addendum # 1 and that there would be no change in contract price. On November 24, 1986, Morano forwarded the Progress Schedule for Phase IV to C & B, and on December 1, 1986 C & B protested that they were not afforded the opportunity to offer their input with regard to the progress schedule but indicated it would resubmit the schedule.
On December 1, 1986, additional sets of the drawings were forwarded to C & B and by letter dated December 12, 1986 C & B advised Morano that there was a conflict between the Plans and Specifications. In Morano's December 16, 1986 letter, Morano forwarded C & B's December 12, 1986 letter to NYANG and stated: "Enclosed is a copy of a letter received from our subcontractor relative to the diesel pumps for the Fire Pump Station."
In a January 5, 1987 letter, Morano stated to C & B: "Please forward to this office by the 25th of each month your requisition," and on January 12, 1987 Morano sent C & B a Schedule of Material Submittals for Phase IV. Morano on January 19, 1987 returned the submittal which NYANG had disapproved with instructions to C & B to "Please revise as noted and resubmit."
Up to this point, both parties assumed that C & B would be the mechanical subcontractor for Morano on Phase IV. However, as noted above, the relationships were troubled. By February 3 the decision had been made not to use C & B on Phase IV and on February 6, it was decided to go forward with Centrum.
C & B was fully aware of the absence of a final agreement with Morano in the form which had been required for Phase III. It had never furnished the required bonds, which were a precondition of a contract. In late January or early February, Barone called Harrington asking if C & B was going to get the contract for Phase IV. Harrington then told Barone that he was not sure. Shattuck, whose views of C & B and Richter have been described, recalled Spinella stating that Morano "was considering hiring Cortolano & Barone for Phase IV," at which point he [Shattuck] asked, "Why?" The point was undoubtedly noted.
At no time did Morano officially submit C & B as its Phase IV subcontractor on NYANG's statement and acknowledgement form. Despite the correspondence, including even Harrington's reference to C & B as "our subcontractor" in his letter to the Contracting Officer, the conditions of a binding contract were never achieved. Morano had undertaken to be bound only by a written, executed contract accompanied by performance and payment bonds to be furnished. Until February both parties anticipated such an agreement, but after February 6, that anticipation was terminated, for many of the same reasons that the Phase III Subcontract was terminated.

Work Performed for Phase IV
The informal agreement to agree was partially executed as described above. C & B did perform certain services for Morano's benefit in the expectation that the Phase IV Subcontract would be executed.
C & B submitted evidence as to work performed, the time taken for the performance and the rates at which these services were charged. A total of $11,878.28 was determined to which was added 10% for overhead and 10% for profit. Morano offered no evidence to counter these calculations but denied any benefit having been received. Morano has also noted that such a procedure for determining costs is not sanctioned by contract, as there was none, *98 nor by trade practice for others than those in the professions characterized by some as learned. However, it certainly is commonly known and accepted that plumbers, mechanics, and executives do on occasion charge on a time charge basis. No other challenge to the rates based on salary was adduced by Morano.
However, the correspondence and bid preparation are part of an anticipated overhead expense and benefitted only C & B in its unsuccessful effort to gain the Subcontract for Phase IV. On the other hand, the buyout and purchase of equipment (even though ultimately rejected by NYANG), the transmittal, work completed on the site, and miscellaneous charges did benefit Morano. Because the rates were based on salary, C & B is entitled to overhead and profit at the same percentage Morano used. The amount Morano must pay for the benefit received under work performed by C & B under Phase IV is as follows:

 Buy out and purchase $6,266.00
 Transmittals 166.48
 Work on site 1,251.00
 Miscellaneous 493.00
 _________
 $8,176.48
 _________
 5% overhead]
 5% profit] 817.65
 _________
 Total: $8,994.13
 =========

Conclusions
Certain conclusions flow relatively inexorably from the facts found above. Jurisdiction of this cause is conferred by the Miller Act, 40 U.S.C. § 270a et seq.
According to the terms of paragraph "Sixth" of the Phase III subcontract, to which both Morano and C & B expressly agreed: "[i]f the Subcontractor fails to prosecute its work in accordance with this agreement or the General Contract, the Contractor, at its option, may terminate this agreement...."
C & B's unexplained pulling of its crew from the site on March 10, 1987 was the straw that broke the camel's back. The following day, the government literally threatened to terminate the mechanical portion of Morano's Phase III general contract because of the lack of progress in that part of the work. Morano, which had repeatedly by letter and meeting sought greater productivity from C & B and Richter's dismissal, recognized that the only way to salvage the Contract in that regard was to terminate the Subcontract and replace C & B at once.
No firm deadlines had been violated, and Morano had given no notice of default or possible termination because until March 10 such a course had not been anticipated. Despite the absence of any contractual protection, a subcontractor alleged to be in default is entitled to receive more notice than C & B received here. See Glen Cove Marina, Inc. v. Vessel Little Jennie, 269 F.Supp. 877, 879-80 (E.D.N.Y.1967); Taylor v. Goelet, 208 N.Y. 253, 258, 101 N.E. 867 (1913); McGowan & Connolly Co. v. Kenny-Moran Co., 207 A.D. 617, 202 N.Y.S. 513, 514 (1st Dep't 1924); 21 N.Y. Jur.2d Contracts § 443, at 367 (1982).
According to the Restatement (Second) of Contracts § 241 (1981), there are several factors to consider in determining whether a breach is material:
(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.
Accord Greyhound Lines v. Bender, 595 F.Supp. 1209, 1224 (D.D.C.1984).
Under the Restatement's factor (a), it is apparent that Morano had been deprived of all of the benefit it reasonably expected from the Subcontract because of the views of the Contracting Officer. However, with reference to the Restatement's factor (d), *99 the failure of Morano's directions provide an opportunity for cure that affects the materiality of C & B's alleged breach.
In the absence of a justified termination, C & B is entitled to recover for its performance under the Subcontract and for any lost profits. See, e.g., Wolkcas Advertising, Inc. v. Latham Circle Mall Merchants Assocs., Inc., 115 A.D.2d 198, 495 N.Y.S.2d 267 (3d Dep't 1985) (upholding summary judgment granting advertising agency the value of the work performed prior to when the defendant cancelled the contract); Abinet v. Mediavilla, 5 A.D.2d 679, 169 N.Y.S.2d 231, 232-33 (2d Dep't 1957) ("Where in fact a written contract exists, a contractor may recover the value of services rendered by him, if he has only partly performed by reason of the defendant's prevention, repudiation, abandonment or waiver of the written contract provisions....") (citations omitted).
However, in view of C & B's failure to prove its lost profits, none will be awarded.
C & B also failed to establish the requisites for a Subcontract to perform the mechanical work under Phase IV of the contract between Morano and the NYANG. Although courts will find contracts in the absence of a written agreement by looking to the parties' objective intent manifested by their expressed words and deeds at the time:
It is recognized that if the parties intend not to be bound until they have executed a formal document embodying their agreement, they will not be bound until then. Int'l Telemeter Corp. v. Teleprompter Corp., 592 F.2d 49, 56, and 57-58 [(2nd Cir.1979)] (Friendly, J. concurring); V'Soske [v. Barwick, 404 F.2d 495, 499 (2d Cir.1968)]; Chromalloy American Corp. v. Universal Housing Systems of America, Inc., 495 F.Supp. 544, 550 (S.D.N.Y.1980); Scheck v. Francis, 26 N.Y.2d 466, 311 N.Y.S.2d 841, 260 N.E.2d 493 (1970); UCC 2-305(4); Restatement (Second) of Contracts § 32, comment c (Tent. Drafts 1-7, 1973); 1 Williston on Contracts § 28 at 66-67 (3d ed. 1957).
Reprosystem, B.V. v. SCM Corp., 522 F.Supp. 1257, 1274-77 (S.D.N.Y.1981), aff'd in part, rev'd in part, 727 F.2d 257 (2d Cir.), cert. denied, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984).
However, C & B is entitled on a quantum meruit basis to recover the value of the benefits it provided Morano during the period when both parties anticipated C & B would receive the Phase IV Subcontract. See General Supply & Constr. Co. v. Goelet, 241 N.Y. 28, 148 N.E. 778 (1925); Robbins v. Frank Cooper Assocs., 19 A.D.2d 242, 241 N.Y.S.2d 259 (1st Dep't 1963); In re Harvey's Will, 15 A.D.2d 834, 224 N.Y. S.2d 767 (3d Dep't 1962).
For the reasons set forth above, C & B is entitled to recover the amounts determined here for work performed against both Morano and its surety.
It is so ordered.
NOTES
[1] Although Morano paid G.A. Fleet, C & B's subcontractor, $13,384.70 it has not demonstrated that the items paid for were part of the work C & B performed prior to termination. Thus C & B's unrebutted testimony states to the effect that all G.A. Fleet was owed on the date of termination was $2,076, whatever was later billed.