UNITED STATES of America for the Use and Benefit of VIRGINIA BEACH MECHANICAL SERVICES, INC., Plaintiff–Counterclaim Defendant,

v.

SAMCO CONSTRUCTION COMPANY and National Grange Mutual Insurance Company, Defendants–Counterclaim Plaintiffs.

No. Civ.A. 2:98CV149.

United States District Court,
E.D. Virginia,
Norfolk Division.

March 10, 1999.

C. Jay Robbins, C. Jay Robbins, IV P.C., Chesapeake, VA, for plaintiff.

Thomas Scott Carnes, Sykes, Carnes, Bourdon & Ahern, P.C., Virginia Beach, VA, for defendants.

## OPINION & ORDER

PRINCE, United States Magistrate Judge.

Virginia Beach Mechanical Services, Inc., ("VBMS"), the use plaintiff, brings this action seeking damages against the defendants, SAMCO Construction Company ("SAMCO"), and its surety, the National Grange Mutual Insurance Company, for breach of two subcontracts pursuant to the Miller Act, 40 U.S.C. § 270a *et seq.* The defendants have denied liability and the defendant SAMCO has counterclaimed, alleging that VBMS failed to properly and fully complete the work required by the two subcontracts at issue. SAMCO contends that this failure entitles it to either a set-off against the damages sought by VBMS, or to damages resulting from the delay and added costs SAMCO incurred in finishing the work left undone by VBMS. The parties have consented to have their claims resolved by a United States magistrate judge, *see* 28 U.S.C. § 636(c) (1998) and FED.R.CIV.P. 73, and the Court has jurisdiction pursuant to 28 U.S.C. § 1331.

At a bench trial held by this Court, the parties presented evidence on the two subcontracts. The first subcontract involved the restoration of the Grand Teton Warehouse ("Teton Warehouse"). SAMCO, the general contractor, had agreed with the owner of this warehouse, the United States Navy, to complete this project, then contracted with VBMS to install and provide materials for the project's plumbing, and heating, ventilation and air conditioning ("HVAC"). SAMCO had also contracted

with the Navy to renovate its storage warehouse at the Oceana Naval Base in Virginia Beach, Virginia. This latter project, known as the "Building 721" project, also required plumbing and HVAC materials, and the installation thereof, and SAMCO formed another subcontract with VBMS to provide them.

Having observed the witnesses and studied the transcript and the 120 exhibits admitted into evidence in this case, the Court FINDS that the plaintiff, VBMS, materially breached its two subcontracts with the defendant SAMCO, and that these breaches thereby discharged SAMCO's obligation to pay VBMS the balances remaining on them. Because the evidence does not establish the costs that SAMCO incurred in excess of its two subcontracts, however, SAMCO cannot recover damages pursuant to its counterclaims. Further, since the evidence also does not prove the existence of a subcontract term expressly prohibiting delays or a reasonable basis for attributing a portion of the project delays to VBMS's breach, SAMCO cannot recover the delay damages it seeks in its counterclaims. Accordingly, the Court cannot award anything more than nominal damages to any of the parties and instead only ORDERS them to bear their own costs in bringing these claims.

## I. FINDINGS OF FACT

As expected, the evidence presented conflicted on several different points. The parties can assume that if certain evidence goes unmentioned, the Court did not find its assertion proven by a preponderance of the evidence. The Court will discuss each subcontract's formation, performance and applicable remedies before addressing the relevant legal issues.

### A. Teton Warehouse

On July 7, 1996, VBMS and SAMCO entered into an agreement wherein SAMCO would pay VBMS $10,000.00 to do the plumbing and HVAC work at the Teton

Warehouse restoration project.[1] (*E.g.*, Tr. at 15; Pl.'s Ex. 15.) The parties agreed that VBMS would perform this work pursuant to the specifications set out in the HVAC and plumbing portions of the prime contract that SAMCO had formed with the Navy. (*See* Defs.' Ex. 17.)

Specifically, their agreement required VBMS to perform the following: provide new heating, ventilation, and cooling systems equipment, including the ducts and piping "located within, on, under, and adjacent to" the warehouse project; provide heat pumps, including a "refrigeration section, additional heating section ... separate outdoor weatherproof anodized aluminum louvers ... fans and motors, controls ... filters," and dampers; provide exhaust fans and "automatic backdraft dampers"; and provide a roof curb for the "roof mounted exhaust fans." (*E.g.*, Defs.' Ex. 1 and Ex. 17; Tr. at 121–23.)

In addition, the subcontract required VBMS to test each system it provided in order "to demonstrate compliance" with the sub-contract's specifications. (Defs.' Ex. 1 and Ex. 17.) VBMS also had to furnish its own materials for conducting these tests. (*See id.*) If these tests showed defects in the HVAC or plumbing systems, VBMS would have had to correct them and repeat the tests until it could ensure contract compliance. (*Id.*) Further, SAMCO and the Navy would consider VBMS's work incomplete until VBMS provided them with the Operations and Maintenance ("O & M") manuals. (*Id.*; Tr. at 118–19.)

Initially, it appears that VBMS had to complete this HVAC and plumbing work on the Grand Teton Warehouse by the "end of May" of 1997. (*See* Tr. at 114.) It also became apparent, however, that the parties and the Navy extended the project completion deadline, which, in turn, would

have allowed VBMS to completely perform at a later date and still receive full payment. (*See* Defs.' Ex. 2.) Other than a schedule listing HVAC and plumbing "lump sum" items, the parties presented little substantive evidence concerning time of payment. (*See* Defs.' Ex. 1.) SAMCO later sent to VBMS letters explaining that it would pay VBMS only for the work it completed. (*See* Defs.' Ex. 8 and Ex. 9; *contrast* Pl.'s Ex. 40.)

VBMS began performing the work required of this subcontract in the "latter part of" January of 1997. (Pl.'s Ex. 15; Tr. at 16–17.) By the Spring of 1997, however, SAMCO had already experienced delays of 111 days in completing its contract with the Navy, primarily because it had not yet received a prefabricated metal building from another subcontractor. (Tr. at 51, 113, 176–77.) On April 30, 1997, the Navy contacted SAMCO, expressed its "grave concerns" over the project's delay and indicated that SAMCO had not yet completed "even" fifty (50) percent of the Teton Warehouse project. (Pl.'s Ex. 3; Tr. at 176.)

The prefabricated steel building did eventually arrive at the project "sometime" in May of 1997. (Tr. at 176–77.) At this point, SAMCO still needed VBMS to complete its plumbing and HVAC work "[t]owards the end of May" of 1997. (Tr. at 114.) VBMS did not do so.

On June 30, 1997, SAMCO's president, Ahmed Said ("Said"), sent via facsimile and mail a notice to the owner of VBMS, John H. Zoeller ("Zoeller"). (Tr. at 114; Defs.' Ex. 3.) The notice directed VBMS to proceed with its work under the subcontract, and indicated that VBMS's delay in performing its contractual duties had brought the Teton Warehouse project to a "standstill." (*Id.*) It also cautioned that

---

1. In response to VBMS' s claim at trial that it had never signed a Teton Warehouse subcontract dated July 7, 1997, (*see* Tr. at 15–16, Pl.'s Ex. 8), SAMCO offered as impeachment evidence a document dated October 16, 1996, and signed by both contractors' respective

agents. (*See* Defs.' Ex. 57; Tr. at 29–30.) Though VBMS may have subsequently waived any objection to it, (*see* Tr. at 34, 42), this document has little, if any, impeachment value, because it plainly refers to the Building 721 subcontract only. (*See* Defs.' Ex. 57.)

continued delays in performance could render VBMS "liable" for delay damages. (*Id.*)

By July 3, 1997, VBMS still had not completed the "rough-in plumbing," as required by its subcontract; it also had not yet installed the necessary piping. (Tr. at 115.) And by July 14, 1997, VBMS personnel had left the Teton Warehouse project site altogether. (Tr. at 26.)

At the time it left the site, VBMS had not, as its owner testified, "live[d] up to this [subcontract] the way [it] should have." (Tr. at 18; *see* Tr. at 118.) First, VBMS had failed to install both the exhaust fan on the roof of the project and the incremental heat pump. (Tr. at 18–20.) It also did not provide, deliver and install "four or five" plumbing fixtures. (Tr. at 21–23, 70–72.) And while VBMS did deliver a roof curb, it neither provided the roof curb called for by the specifications nor installed that roof curb. (Tr. at 51–53, 184–85; *see* Def.'s Ex. 17.) In addition, VBMS failed to provide various roof fans, louvers, sheet metal ducts, (Tr. at 59; Def.'s Ex. 13 and Ex. 17), and it failed to properly perform some minor plumbing work. (*See* Tr. at 73.)

On July 15, 1997, VBMS and Zoeller received from SAMCO and Said another facsimile message advising VBMS to finish its work at Teton Warehouse by 10 a.m., on July 16, 1997. (Defs.' Ex. 5.) On July 18, 1997, SAMCO delivered another facsimile message acknowledging receipt of VBMS's previous letter, and reminding VBMS that it still had to install the heat pump and provide, among other items, the louvers, fans, and rough-in plumbing. (Defs.' Ex. 6; Tr. at 19, 115–16.) And on July 24, 1997, SAMCO sent via facsimile a third letter asking VBMS to complete its work at the Teton Warehouse project. (Defs.' Ex. 7; Tr. at 41.) VBMS did not respond to the SAMCO letters dated July 15, 1997, and July 24, 1997. (Defs.' Ex. 5; *see* Tr. at 45–47.)

Already under pressure from the Navy to complete the project, (*see, e.g.,* Pl.'s Ex.

3; Tr. at 136), SAMCO hired various other contractors to finish and correct the plumbing and HVAC work. It paid Maule, Inc. ("Maule"), $250.00 to install and provide a roof curb that complied with the contract specifications. (*See* Tr. at 53, 123; Defs.' Ex. 10.) It also paid Shoreline, Inc. ("Shoreline"), $4102.00 to provide and install a roof fan, two exhaust fans and two louvers. (Defs.' Ex. 13; Tr. at 59, 123.) Because Shoreline had to supply and perform these materials and services on short notice, it marked up the price it charged SAMCO by twenty (20) percent. (Tr. at 67.) And for $1086.50, Annarino Plumbing ("Annarino") supplied SAMCO with the plumbing fixtures not provided by VBMS, (Defs.' Ex. 12; Tr. at 23), while for $422.25, SAMCO had Annarino re-do plumbing work that VBMS had not completed in accordance with contract specifications. (Defs.' Ex. 12; Tr. at 70–71.)

By July 31, 1997, SAMCO had paid VBMS $1165.00 out of its $10,000.00 subcontract. (Pl.'s Ex. 15; Tr. at 17.) Months later, in response to VBMS's request for payment, SAMCO sent VBMS another letter asking it to "please provide all O & M manuals" and applicable warranties. (Defs.' Ex. 8 and Ex. 9; Tr. at 118–19.) SAMO later sent VBMS a similar letter seeking the same information. (*See id.*) Both letters also reminded VBMS that SAMCO and the Navy needed the O & M manuals before they could consider VBMS's work complete. (*See id.*)

While VBMS never provided the O & M manuals, no evidence in the record clarifies how much SAMCO spent to acquire those manuals. Also, while a schedule of values lists, but does not quantify, some of the items that VBMS had to provide for the Teton Warehouse subcontract, (Defs.' Ex. 1), the evidence does not establish how much of each item or service VBMS had fully provided, installed or otherwise completed before it abandoned the project. Nor does it specify the per unit price that the subcontract had placed on each item

supplied, and the evidence presented at trial did not help.

On October 24, 1997, SAMCO completed the Teton Warehouse project for the Navy.[2] (Tr. at 182.) Shortly thereafter, the Navy paid SAMCO the contract price pursuant to their agreement, but, as their agreement's liquidated damages clause specified, it subtracted $6200.00 from its final payments because of the delays in completing the project. (Tr. at 151, 190.)

In his testimony, Said also claimed that VBMS's failure to fulfill its subcontract caused SAMCO personnel to spend additional time overseeing the Teton Warehouse project. He also alleged that he himself lost time ordinarily spent working elsewhere on finding and purchasing certain supplies. It appeared at trial that Said based these estimates on nothing more than his own handwritten notes, which Said apparently prepared for trial. (See, e.g., Tr. at 152–53.) The Court finds that SAMCO has not proven that it actually incurred these losses, and, therefore, that it cannot recover damages for them.

Similarly, Said alleged that VBMS owed it one-third of the $6200.00 liquidated damages assessed by the Navy, or $2066.67. (Tr. at 163–64.) The Navy had arrived at $6200.00 by multiplying the prime contract's $200.00/day figure contained in its liquidated damages clause by the thirty-one (31) day delay in project completion. At trial, Said indicated that he "thought" VBMS caused it to suffer an eleven (11) day delay "by not showing up to do the job when the job was in a critical stage sometime in July" of 1997. (Tr. at 164.) He did not indicate then how many other subcontractors delayed the project, but, in one signed document, he told the Navy that at least "some . . . subcontractors and suppliers did not live up to their" agreements. (Pl.'s Ex. 13.) He also did not address the

111 day delay caused by another subcontractor.

### B. *Building 721*

On October 16, 1996, VBMS formed another subcontract with SAMCO, to provide "all" plumbing and HVAC materials and services for another "old [Naval] . . . storage warehouse" renovation project. (E.g., Def.'s Ex. 57; Tr. at 7, 63–64.) VBMS agreed to provide this in exchange for $47,000.00. (Pl.'s Ex. 57; Defs.' Ex. 19; Tr. at 7, 138.) The parties' subcontract incorporated by reference the HVAC and plumbing specifications described in the Building 721 prime contract, which, of course, the Navy had awarded to SAMCO. (Defs.' Ex. 57.)

These specifications, in turn, required VBMS to provide many of the same services and materials required by its Teton Warehouse subcontract. For example, under the agreement, VBMS had to supply and install, among numerous other items, seventeen (17) access doors, a backdraft door, a "pressure reducing valve," miscellaneous piping and fittings, and dampers and louvers. (E.g., Tr. at 62–64, 95, 97–98.) It also required VBMS to provide and install the following: rough-in plumbing and plumbing fixtures; roof-top air conditioning; unit heaters, "stm" coil and piping; a "cond. pump"; exhaust fans and grilles; pipe and duct insulation; and various "controls." (E.g., Defs.' Ex. 19.)

Further, the Building 721 subcontract indicated "[p]rogress payments" would occur "no later than five (5) working days of receipt of payment from" the Navy. (Defs.' Ex. 57.) And VBMS had to test all of its work and equipment and certify that it complied with contract specifications. (Defs.' Ex. 18; Tr. at 144.) It also had to provide SAMCO with all O & M manuals and warranties on the Building 721 project. VBMS initially had to complete sub-

---

2. Unlike VBMS, the Court does find that SAMCO fully performed its contract with the Navy by October 24, 1997. As Said explained, the October 27, 1997, invoices from

Maule, Inc., referred to work that Maule performed in July of 1997, not October 27, 1997. (Tr. at 183–84.)

contract performance by January 30, 1997, but, for reasons not contested and not apparent in the record, that completion date later became May 31, 1997. (*See, e.g.,* Defs.' Ex. 57 and Ex. 29.)

On April 7, 1997, after it had already begun performing at the project site, VBMS requested an additional $1941.00 to help it complete the duct work required by its subcontract. (Pl.'s Ex. 43; Tr. at 182.) As the subcontract mandated, only the Navy could approve change orders, and, sometime after VBMS made this request, the Navy approved a change order for the duct work for $1911.65. (*Id.;* Tr. at 181–82.) No other modifications or change orders in the subcontract were approved.[3] (*See* Tr. at 138, 140.)

In that same month, another dispute arose over the costs that VBMS would incur if, as required by the subcontract, it installed a drain at the project. (Defs.' Ex. 22.) VBMS indicated that it did not have to cover these costs because it thought the project's drawings showed "crawl space" when, in fact, the relevant areas requiring this drain had "compacted space." (*See id.;* Tr. at 127–29.) The Navy denied the request for additional payment to address this difficulty and, pursuant to both the prime and subcontracts, ordered SAMCO and VBMS to continue working on the project. The Navy also noted, however, that VBMS and SAMCO could appeal its decision not to award additional payment for this work.

To appeal such a decision, a subcontractor ordinarily must supply the necessary paperwork and information supporting its claim to the general contractor. (Tr. at 127–29.) The general contractor then forwards the information submitted by the subcontractor to the Navy, who eventually rules on the claim. (*Id.*) As noted earlier, the prime and subcontracts in this case dictated that all parties had to continue working on the Building 721 project while the Navy adjudicated claims for additional payment. (*Id.;* Defs.' Ex. 57.) Further, while SAMCO advised VBMS of this procedure and of its obligation to provide it with the documentation supporting its claim, VBMS never forwarded any such documentation. (*See id.*)

By letters sent via facsimile on both May 7, 1997, and May 12, 1997, SAMCO directed VBMS to complete its work on the Building 721 subcontract by May 20, 1997. (Defs.' Ex. 25 and Ex. 26.) VBMS did not complete its work by then, and, on May 22, 1997, the Navy rejected VBMS's invoice seeking payment because VBMS had not completely performed. (*See* Tr. at 131–32.) Later that month, Said told Zoeller that notwithstanding the Navy's rejection of VBMS's invoice, SAMCO would still pay VBMS $47,000.00 so long as it completed its work by the "end of May." (*See* Tr. at 132–33.)

Zoeller subsequently contacted Said and indicated that VBMS could not complete its work at Building 721 because Zoeller had gone "broke [and] couldn't finish the job ... if [SAMCO] didn't pay him." (*Id.*) SAMCO responded by paying VBMS $30,-000.00 of their $47,000.00 subcontract. Nonetheless, VBMS did not complete its work at the project site by the end of May of 1997. (*Id.*)

On June 20, 1997, and again on June 26, 1997, SAMCO notified VBMS that it still had not completed its subcontract at Building 721. (Defs.' Ex. 29 and Ex. 31; Tr. at 135.) And despite VBMS's testimony to the contrary, (*e.g.,* Tr. at 19–20), nothing

---

**3.** VBMS, however, contends that SAMCO agreed to pay it an additional $4130.00 for a second change order request. (*See* Defs.' Ex. 54; Tr. at 138–39, 142, 146.) SAMCO denies this. (*Id.*) As noted above, the Court finds that neither a handwritten notation on a VBMS invoice dated nearly three months after VBMS's performance was due, nor the testimony that Zoeller gave on this controversy established the existence of this alleged agreement. Zoeller himself admitted that he never saw an approved change order for this work, though he did add the caveat that he never saw "any of the approved change orders." (*See* Tr. at 33.)

that SAMCO had or had not done at either project site prevented VBMS from performing its obligations then. (*See, e.g.,* Tr. at 133–36.) Zoeller's hostile and frequently nonresponsive testimony in general, and on this factual dispute in particular, contrasted sharply with Said's calm demeanor, and while the Court has reason to doubt either witness's veracity, it ultimately finds Said's version more credible. Neither witness contested that on July 7, 1997, VBMS personnel left, and never returned to, the Building 721 project site. (*E.g.,* Tr. at 23–26.)

At trial, Zoeller also alleged that VBMS had completely performed its subcontract at the time it left the Building 721 site. (Tr. at 23.) The Court disagrees, and instead finds that VBMS failed to properly repair and install minor plumbing materials, as required by the subcontract's specifications. (*See* Defs.' Ex. 42; Tr. at 96–97.) It also failed to provide and install 17 access doors, a backdraft door, a return grille, a pressure reducing valve, and other miscellaneous items required by its Building 721 subcontract. (Def.'s Ex. 44; Tr. at 136.) Further, VBMS neither tested the piping, (Tr. at 136), nor provided all the requisite piping materials. (*See, e.g.,* Defs.' Ex. 19.) And it never provided SAMCO or the Navy with the O & M manuals for the project. (Defs.' Ex. 37; Tr. at 141.)

On July 15, 1997, SAMCO directed VBMS via another letter to complete the "outstanding items" at Building 721 by July 17, 1997. (Defs.' Ex. 33; Tr. at 35, 135.) Zoeller claimed at trial that he never received this letter. (Tr. at 43–44.) Because of several inconsistencies with his testimony, including several that poorly reflected on Zoeller's alleged "habit" of responding to correspondence, (*see* Tr. at 45–47), the Court simply does not accept this testimony as true. Despite this notice, VBMS never responded or, as noted, returned to the Building 721 project.

When VBMS did not respond, SAMCO began hiring other subcontractors to complete the remaining HVAC and plumbing work. On July 22, 1997, it had Kellam Mechanical fix a wiring problem with the air conditioning equipment that VBMS had installed, in exchange for $50.00. (Defs.' Ex. 53; Tr. at 55–57.) It also paid $4609.00 to Shoreline, the subcontractor also used at the Teton Warehouse project, to provide and install, among other materials, 17 access doors, a backdraft damper, and a return grille. (*See* Defs.' Ex. 44; Tr. at 142–43.)

For a total of $1705.00, Annarino, the plumbing company, also performed "miscellaneous" plumbing work for SAMCO on "July 22, 28, 31," 1997, "August 11, 14, and 28, 1997," and again on September 11, 1997. (Defs.' Ex. 42 and Ex. 43; Tr. at 74, 143.) SAMCO itself purchased some minor piping supplies for $10.76 to help it complete the project's HVAC and plumbing requirements. (Def.'s Ex. 52; Tr. at 145.) And on August 13, 1997, Pure Air, Inc. ("Pure Air"), another subcontractor hired by SAMCO, tested the HVAC systems at the Building 721 project in exchange for $1000.00. (Tr. at 144; Defs.' Ex. 49.) The tests determined whether the HVAC system complied with the contract and subcontract specifications.[4] (*See id.*)

---

4. SAMCO offered evidence showing that it also had to have the Diamond Equipment Contracting Corporation ("Diamond Equipment") "core drill a concrete beam for … [the] piping to go through," a task that SAMCO said VBMS had to perform under the subcontract. (*See* Tr. at 144–45.) SAMCO had to pay $143.33 to have this done. (Defs.' Ex. 50.) Because Diamond Equipment's invoice for this work is dated April 30, 1997—a full month before VBMS initially had to complete performance—the Court doubts that this work fell within either the subcontract or, as Said testified, "the claim that [VBMS] should have made to the Navy." (*See* Tr. at 145; *see also* Defs.' Ex. 50.) Since the Court cannot tell if this subcontract did indeed include this work, and since it also appears that SAMCO never gave VBMS an opportunity to perform it even if it did, SAMCO cannot attribute these costs to VBMS.

As with the Teton Warehouse subcontract, SAMCO also offered testimony on the additional "time [and] energies" it believed it spent to complete the project's HVAC and plumbing requirements. (*See* Tr. at 153, 155, 162, 165.) Again, however, SAMCO appeared to base these lost time estimates on Said's own informal calculations and on what Said "felt" and thought was "fair." For the same reasons discussed earlier, the Court finds these expenses not proven by a preponderance of the evidence. (*See id.*) And while VBMS also never provided the O & M manuals for Building 721, the Court has found no evidence showing whether SAMCO actually incurred additional costs in obtaining them from another subcontractor. (*See* Tr. at 166.)

## II. *CONCLUSIONS OF LAW*

■ Under the Miller Act, a subcontractor in a federal government project may bring actions against that project's general contractor and surety for claims sounding in contract or quasi-contract. *See United States of America ex rel, B & M Roofing v. AKM Assoc., Inc.,* 961 F.Supp. 1441, 1443–45 (D.Colo.1997); *see also United States of America ex rel. Coastal Steel Erectors, Inc. v. Algernon Blair, Inc.,* 479 F.2d 638, 640 (4th Cir.1973). The parties agree that ordinary principles of contract law govern the substantive claims at issue. *Id.* Accordingly, those principles apply to the issues that the parties and the facts in this case raise: breach of contract, the applicability and computation of direct damages, and the general contractor's duty to coordinate contract performance. *See id.* The Court addresses these, as well as VBMS's abbreviated interpretation of the Prompt Payment Act, 31 U.S.C. §§ 3901–3907 (1998), below.

### A. *Breach of Contract*

■ As the Court's findings indicate, VBMS materially breached both its subcontracts with SAMCO. When a party does not fully complete its contract, the nonbreaching party's remedies turn on whether that failure to perform constitutes a material or a minor breach. *See generally* RESTATEMENT (SECOND) OF CONTRACTS § 243 (1981). A minor breach may allow the aggrieved party to recover damages or a set-off against the breaching party, but it does not excuse that aggrieved party from performing. *See* RESTATEMENT (SECOND) OF CONTRACTS §§ 241 and cmt. a., 251; *Neely v. White,* 177 Va. 358, 366, 14 S.E.2d 337, 341 (1941); *see also R.G. Pope. Constr. Co., Inc. v. Guard Rail of Roanoke, Inc.,* 219 Va. 111, 118–21, 244 S.E.2d 774, 778–80 (1978). A material breach, on the other hand, does entirely discharge the aggrieved party's obligation to perform. *See* RESTATEMENT (SECOND) OF CONTRACTS § 241, cmt. d; *Stone Forest Indus., Inc. v. U.S.,* 973 F.2d 1548, 1550 (Fed.Cir.1992); *Cascade Energy and Metals Corp. v. Banks,* 896 F.2d 1557, 1579 (10th Cir.1990).

■ A material, as opposed to a minor, breach occurs when the nonbreaching party did not receive the substantial benefit of its bargain. *Id.; First Interstate Bank v. Small Bus. Admin.,* 868 F.2d 340, 346 (9th Cir.1989). In making this determination, courts assess the totality of the circumstances, including: 1) the extent to which a party's breach deprived the injured party of the benefit it reasonably expected; 2) the extent of the contract that the breaching party did perform; 3) the likelihood that the breaching party will cure its failure to perform, including any reasonable assurances of performance it did or did not give; and 4) the extent to which the behavior of the party failing to perform comported with standards of good faith and fair dealing. *Stone Forest Indus., Inc.,* 973 F.2d at 1552; *United States of America ex rel. Cortolano & Barone, Inc. v. Morano Constr. Corp., et al.,* 724 F.Supp. 88, 98–99 (S.D.N.Y.1989); RESTATEMENT (SECOND) OF CONTRACTS at §§ 241–42.

■ Here, the facts established in the Teton Warehouse subcontract show that VBMS failed to provide or install, or both,

the following items covered by its subcontract with SAMCO: an exhaust fan on the roof and an unknown number of roof fans; an incremental heat pump; "four or five" plumbing fixtures; a roof curb that met contract specifications; some louvers and sheet metal ducts; and some minor plumbing work. Further, since it cost SAMCO $5860.75 to furnish, replace, repair and otherwise complete this unfinished work, and since the subcontract price itself was only $10,000.00, VBMS failed to perform a significant portion of its duties. And since VBMS failed to give adequate assurances of performance in response to at least two SAMCO letters that demanded it, SAMCO had little reason to believe that VBMS would cure its breach. Indeed, VBMS did not respond at all to these letters.

Accordingly, because VBMS's breach substantially deprived SAMCO of the benefit it reasonably expected, and because VBMS left much of its Grand Teton subcontract unfinished and failed to provide SAMCO with reasonable assurances that it would, in fact, perform, VBMS did materially breach the Grand Teton subcontract. *See Morano Contr. Corp.*, 724 F.Supp. at 98–99; RESTATEMENT (SECOND) OF CONTRACTS at § 241. The Court concludes, therefore, that this breach discharged SAMCO's duty to pay the remaining balance owed VBMS on the Grand Teton subcontract.

■ Similarly, the evidence demonstrates that VBMS failed to provide the following, as required by the Building 721 subcontract: an uncertain number of minor plumbing materials; 17 access doors, a backdraft door, a return grille, a pressure reducing valve, and various other miscellaneous items; a test of the HVAC or

plumbing system, to ensure subcontract compliance; and the O & M manuals. It also incorrectly installed wiring equipment for an air conditioner.

As with the Grand Teton subcontract, neither the Building 721 subcontract nor the other evidence presented at trial delineated or otherwise established the exact number and prices of the individual items that VBMS failed to install or provide. The evidence does show, however, that replacing or repairing these items cost SAMCO $7374.76, or approximately 16 percent of the $47,000.00 subcontract price. Although principles of contract law do not rely on "percentages alone" to discern between a material and a minor breach, *see* RESTATEMENT (SECOND) OF CONTRACTS at § 275, the Court finds that, under the totality of circumstances, this failure still significantly deprived SAMCO of the benefit it expected under the subcontract. And as with the Grand Teton subcontract, VBMS simply abandoned the project site shortly after SAMCO demanded performance of the work VBMS needed to finish there.

Again, therefore, since VBMS failed to perform a significant portion of the work required by the Building 721 subcontract, and since SAMCO received neither the substantial benefit of its bargain nor adequate assurances to perform despite giving VBMS proper notice, VBMS also materially breached this second subcontract.[5] *See Morano Contr. Corp.*, 724 F.Supp. at 98–99; RESTATEMENT (SECOND) OF CONTRACTS at § 241. In so doing, it also discharged SAMCO's obligation to pay the remaining balance on this agreement.

■ Under similar principles, however, nor does a preponderance of the evidence

---

5. *VBMS's memorandum does not argue or allege that SAMCO failed to make a significant portion of its progress payments, giving VBMS the right to suspend performance on its two subcontracts. (See Pl.'s Post–Trial Mem. at 1–7.) Since SAMCO did make payments on each subcontract, and since no reliable evidence demonstrates that VBMS submitted invoices or otherwise demanded* payments before it abandoned the projects, (*see* Tr. at 36, 118, 137), the Court doubts this argument would succeed even if VBMS had raised it. *See Vecco Constr. Indus., Inc. v. Century Constr. Co.*, 30 B.R. 945, 948–49 (Bankr.E.D.Va.1983); *see also Stewart v. C & C Excav. & Constr.*, 877 F.2d 711, 714 (8th Cir.1989).

make VBMS liable for one-third of the liquidated damages that SAMCO incurred because of the delay on the Teton Warehouse project. A failure to perform by the time stated in a contract ordinarily does not amount to a material breach. *See generally United States of America ex rel. Falco Constr. Corp. v. Summit Gen. Contr. Corp.*, 760 F.Supp. 1004, 1011–13 (E.D.N.Y.1991).

If the nature of the contract makes timely performance essential, however, or if the contract expressly provides that time is of the essence, a failure to timely perform may indeed rise to the level of a material breach. *Id.; Broadway Main. Corp. v. Rutgers*, 90 N.J. 253, 260–62, 447 A.2d 906, 910 (1982). In this instance, courts will deem a delay in contract performance a material breach when 1) the party caused a substantial delay in performance; 2) a contract term expressly forbids such delays; and 3) the aggrieved party incurred actual damages or other compensable injuries as a result. *United States of America ex rel. Gray Bar Elec. Co., Inc. v. J.H. Copeland & Sons Constr., Inc.*, 568 F.2d 1159, 1161–62 (5th Cir.1978); *Summit Gen. Contr. Corp.*, 760 F.Supp. at 1011–12.

Of course, the party claiming it incurred added costs because of a delay has the burden of proving those costs. *Id.; United States v. Citizens & Southern Nat. Bank of Atlanta*, 367 F.2d 473, 480 (4th Cir.1966). And "[i]f there are factors for which the defendant is responsible and factors for which it is not, the [party alleging a delay caused a material breach] must provide a reasonable basis for apportioning the damages." *Copeland & Sons Constr., Inc.*, 568 F.2d at 1162; *Citizens & Southern Nat. Bank of Atlanta*, 367 F.2d at 480.

In this case, the Court cannot even tell if the Teton Warehouse subcontract expressly prohibited delays in performance. *See Copeland & Sons Constr., Inc.*, 568 F.2d at 1160. Further, since at least one other subcontractor caused SAMCO to suffer 111 days in delays, and since it appears that "some" other subcontractors may have also stalled contract performance, the Court cannot conclude from Said's bald assertions alone what role, if any, that VBMS's actions played in delaying the ultimate completion of SAMCO's prime contract by only thirty-one (31) days. *See id.*

The Court finds, therefore, that SAMCO did not provide a "reasonable basis for apportioning the damages" among VBMS and the other subcontractors who were obviously a substantial factor in the delay that did result. *See id.* at 1162. Accordingly, because SAMCO's evidence in support of delay damages fails to satisfy at least two of the elements described *supra*, and because it appears that SAMCO based its calculations on little more than conjecture, it cannot recover the $2066.67 sought in its counterclaim. *See id.; see also Citizens & Southern Nat. Bank of Atlanta, supra.*

### 1. Condition Precedent

Because the Court finds that VBMS's material breaches discharged SAMCO's obligation to pay the balances remaining on both subcontracts, it does not reach SAMCO's argument concerning the subcontracts' creation of a condition precedent. (*See* Defs.' Post–Trial Mem., filed Oct. 27, 1998, at 1–5.) In short, SAMCO insinuates that, under the terms of these subcontracts, it only had to pay VBMS when or if VBMS fully completed "lump sum" portions of those agreements. (*See id.; see also* Tr. at 124–27, 131–32.)

The difference between a promise and a condition precedent is significant, of course. Failing to perform the former may still give a party that does not completely perform its contract a cause of action for breach. Failing to completely perform the latter affords the party not fulfilling a condition neither a right of performance from the other, nor a viable cause of action. 3 A.L. CORBIN, CORBIN ON

CONTRACTS § 628 (1960); RESTATEMENT (SECOND) OF CONTRACTS at § 224.

If the Court did have to address this matter, it would find that the subcontracts here only make payment an unconditional promise that SAMCO had to fulfill at the time fixed by each subcontract. As previously noted, the language of the Building 721 subcontract states that "[p]rogress payments will be made in accordance with the approved schedule of values no later than five (5) working days of receipt of payment from the" Navy. (Defs.' Ex. 57.) Nothing in either that document or in any of the other documents that form the parties' agreement as it existed on October 16, 1996—or any time thereafter—uses words that clearly condition SAMCO's duty to make payments on complete performance. Similarly, the substantive evidence setting forth the terms of the Teton Warehouse subcontract only establishes that VBMS had to divide its services into lump sum items. (E.g., Defs.' Ex. 1.) The Court has found no contractual language that clearly makes payment conditional on complete performance, and it finds Said's testimony to the contrary, (see Tr. at 124–27), unpersuasive.

Therefore, since courts generally construe terms in a contract as a promise, and since they also resolve an ambiguity concerning a payment term in favor of construing that term as a promise, this Court believes that the parties did, in fact, intend to make SAMCO's duty of payment a mutually-enforceable promise, and not a condition precedent. See 3 A.L. CORBIN, CORBIN ON CONTRACTS at § 633; RESTATEMENT (SECOND) OF CONTRACTS at § 227(2) and cmt. d (1982). Thus, if the Court had to reach the issue involving a condition precedent, it would probably determine that VBMS's failure to completely perform its

subcontract would not extinguish SAMCO's contractual obligation to pay.[6]

B. *Calculation of Damages*

■ Though SAMCO proved that VBMS materially breached its two subcontracts, it has not shown that it suffered direct damages. A material breach not only discharges the nonbreaching party's duty to perform, it also entitles it to seek redress against the party committing the breach. E.g., Stone Forest Indus., 973 F.2d at 1550–51. And the usual remedy for this breach seeks to place the aggrieved party in the position it would have been had the promise been performed. See RESTATEMENT (SECOND) OF CONTRACTS at § 344, cmt. b, § 350 cmt. c (1979). Thus, to give that party the benefit of the bargain, courts usually award direct damages, which comprise the expenses the aggrieved party "naturally" incurred because of the breach. NAJLA Assoc., Inc. v. Griffith, 253 Va. 83, 86–87, 480 S.E.2d 492, 494 (1997).

■ The direct damages that result from a breach of contract usually equal the difference between the contract price and the cost of buying substitute goods or otherwise having another subcontractor cover the work that the contract required. RESTATEMENT (SECOND) OF CONTRACTS at § 347. The injured party can only recover these damages, however, if their amount is capable of computation. See id.; Al–Ev Const. v. Ahern Main. & Supply, 141 A.D.2d 591, 529 N.Y.S.2d 354, 356 (1988). And if a court is not reasonably certain of this computation, the party can then only recover nominal damages. Id.; RESTATEMENT (SECOND) OF CONTRACTS at §§ 328, 329, 331.

■ In this case, SAMCO has proven that it had to pay $5860.75 to cover the

---

**6.** SAMCO's behavior following subcontract formation gives the Court added confidence in this analysis. For example, after SAMCO hired other subcontractors to complete the work VBMS failed to finish, it still sent VBMS at least two letters indicating that it would only pay VBMS for the work it performed. (See Defs.Ex. 8 and Ex. 9.) If SAMCO truly intended to make performance a condition precedent, it would not have had to pay VBMS at all.

work VBMS failed to perform at Teton Warehouse, and another $7374.76 for the work VBMS did not complete at Building 721. Yet, the Court cannot reasonably ascertain from the record the total number of items, or their unit cost, that remained unfinished. Instead, from the facts adduced at trial, it appears that SAMCO even saved money by hiring other subcontractors to complete these various contractual duties: it ultimately paid only $1165.00 to VBMS plus $5860.75 for a total cost of $7025.75, for a Teton Warehouse subcontract otherwise priced at $10,000.00. *Compare Ahern Main. & Supply,* 141 A.D.2d at 593, 529 N.Y.S.2d at 356 (contractor who saved approximately $3600.00 after subcontractor abandoned project by having other contractors finish work "did not suffer any compensable loss" and could only "receive nominal damages on its counterclaims"). And for the Building 721 project, the evidence proved that SAMCO's expenditures for completing the HVAC and plumbing subcontract came to $7374.76—the cost of covering or replacing VBMS's unfinished or improperly performed work—plus the $34,462.00 it did pay VBMS, for a subcontract otherwise priced at $47,000.00. *Compare id.*

 Therefore, since the Court would largely have to speculate on the exact number of services and supplies that SAMCO eventually had to have other subcontractors perform, it cannot order VBMS to pay direct damages for its two material breaches.[7] *See Fidelity Ins. Agencies v. Citizens Casualty Co.,* 194 F.2d 43, 47 (7th Cir.1952) (nominal award of one dollar in damages appropriate when "nothing in record indicated what plaintiff's loss was or how amount was calculated"). And even if the Court did fathom a guess on the exact extent of the work and materials left undone, it would still ultimately conclude that SAMCO only financially benefitted from VBMS's breaches. Accordingly, because a party not proving actual damages for breach of contract is entitled to nominal damages only, *see* RESTATEMENT (SECOND) OF CONTRACTS at § 328, the Court ORDERS VBMS to pay the token sum of two (2) dollars for its breaches, or one (1) dollar for each breach.

## C. *The Duty to Coordinate Performance*

 The Court's findings of fact largely forecloses VBMS's conclusory claim that SAMCO breached a duty to coordinate the two projects. A subcontractor to a construction project may recover for breach of contract when another project contractor hinders it from performing its duties. *See* RESTATEMENT OF CONTRACTS at § 315; 16 A.L.R.3d 1252. In a project involving multiple contractors, however, the duty to coordinate work and thereby avoid hindrances does not necessarily fall on the general contractor; instead, the terms of the various contracts involved will determine who assumed that obligation. *See Broadway Main. Corp.,* 90 N.J. at 265–66, 447 A.2d at 912; *R.G. Pope Constr. Co., Inc.,* 219 Va. at 118–19, 244 S.E.2d at 778–79; *J.F. Edwards Constr. Co. v. Illinois Toll Hwy. Auth.,* 34 Ill. App.3d 929, 931–32, 340 N.E.2d 572, 574 (1975).

Further, at least one court has noted that if "no one were designated to carry on

---

7. VBMS devotes considerable space in its post-trial memorandum attempting to characterize SAMCO's claimed damages as "consequential," as opposed to direct, damages. (Pl.'s Post-Trial Mem., filed Nov. 30, 1998, at 1–2.) In light of the findings and conclusions, discussed *supra,* the Court need not rule on this distinction. If it did, however, it would find that SAMCO only sought direct damages because, contrary to VBMS's strained application, the cost of hiring other subcontractors to do VBMS's work does, of course, "arise

'naturally' or 'ordinarily'" from VBMS's breaches. *See NAJLA Assoc., Inc. v. Griffith,* 253 Va. 83, 86–87, 480 S.E.2d 492, 494–95 (1997); *Duggin v. Williams,* 233 Va. 25, 28–29, 353 S.E.2d 721, 723–24 (1987); *Roanoke Hosp. Assoc. v. Doyle & Russell, Inc.,* 215 Va. 796, 801–03, 214 S.E.2d 155, 160–62 (1975). As SAMCO correctly notes, "no damages could be more direct than those incurred to complete work left undone by VBMS." (Defs.' Response to Pl.'s Post-Trial Mem., filed Jan. 19, 1999, at 2–3.)

the overall supervision, the reasonable implication would be that the owner would *** impliedly assume the duty to coordinate the various contractors to prevent unreasonable delays on the project." *Broadway Main. Corp.*, 90 N.J. at 265–66, 447 A.2d at 912; *see also Paccon, Inc. v. United States,* 185 Ct.Cl. 24, 399 F.2d 162, 169–70 (1968). And if the owner did "fractionalize those supervisory functions," courts must then look to the language in the contracts involved in the project to determine who agreed to "orchestrate and coordinate" performance. *Id.*

██ This Court, however, does not need to sift through various views on the duty to coordinate to adjudicate VBMS's claim here, because it has already found that, as a matter of fact, SAMCO did nothing to prevent VBMS from performing its duties at either project. VBMS, in an eleventh hour effort to bolster its evidence, suddenly notes in its post-trial brief that four exhibits show that the Navy had become disgruntled with the delays in completing each project. Yet, nothing in these exhibits reveals that SAMCO itself caused the delays; indeed, SAMCO insisted in one of them that some of SAMCO's various subcontractors "did not live up to their obligations." (Pl.'s Ex. 13.) Having evaluated the evidence, the Court thinks it a fair inference that VBMS itself was one such subcontractor.

In addition, the Court notes that VBMS has not even bothered to identify anything in the record showing that SAMCO, and not the Navy, had even assumed this duty to coordinate. *See. Broadway Main. Corp.*, 90 N.J. at 265–66, 447 A.2d at 912. While SAMCO may have, in fact, inherited this duty by virtue of its status as general contractor, the Court will not make that assumption absent evidence proving as such, especially since other evidence indicates that the Navy did coordinate at least some of the work at the projects. (*See, e.g.*, Tr. at 73, 75, 80, 93–94, 96–97.)

This failure to evidence responsibility for the coordination of the projects further

distinguishes the instant case from *R.G. Pope Constr. Co., Inc.*, 219 Va. at 118–19, 244 S.E.2d at 778–79, the only case cited by VBMS in support of this claim. There, unlike here, a general contractor and subcontractor incorporated a term from the prime contract requiring the general contractor "to do everything ... reasonably necessary to enable [the subcontractor] to perform within the time agreed." *Id.* The court found that the general contractor failed to satisfy this "condition," and in so doing, caused the subcontractor to fail. *R.G. Pope Constr. Co., Inc.*, 219 Va. at 119–20, 244 S.E.2d at 779–80.

Since neither VBMS nor the Court's own review of the record has yielded any express or implied contractual obligation "to do everything ... reasonably necessary" for VBMS's performance, and, more importantly, since the Court has already found VBMS, not SAMCO, responsible for its own failures to perform, VBMS cannot reasonably rely on *R.G. Pope Constr. Co., Inc.*, 219 Va. at 119–20, 244 S.E.2d at 779–80. Accordingly, as SAMCO did nothing to prevent VBMS's performance and the record does not clearly indicate whether SAMCO, the Navy or some other party actually assumed the duty to coordinate, the Court finds VBMS's claim here meritless.

### D. *Prompt Payment Act*

In a conclusion remarkably devoid of analysis, (*see* Pl.'s Post–Trial Mem. at 2–4), VBMS also declares that SAMCO violated the "clear and unambiguous" provisions of the Prompt Payment Act ("Act"), and, by extension, its respective subcontracts. Because this dispute relates to a prime contract with an agency of the United States, the Act does apply here, and the two subcontracts do incorporate, by operation of law, the Act's provisions. *See* 31 U.S.C. § 3905(b). The issue appears to be a question of first impression for this Court.

VBMS argues that SAMCO breached its two agreements by failing to comply with

the Act's notice provisions. In so arguing, it does little more than identify and quote the following language:

(e) If a prime contractor, after making application to an agency for payment under a contract but before making a payment to a subcontractor for the subcontractor's performance covered by such application, discovers that all or a portion of the payment otherwise due such subcontractor is subject to withholding from the subcontractor in accordance with the subcontract agreement, then the prime contractor shall—

(1) furnish to the subcontractor a notice conforming to the standards of subsection (g) of this section as soon as practicable upon ascertaining the cause giving rise to a withholding, but prior to the due date for subcontractor payment;

(2) furnish to the Government, as soon as practicable, a copy of the notice furnished to the subcontractor pursuant to paragraph (1) of this subsection;

(3) reduce the subcontractor's progress payment by an amount not to exceed the amount specified in the notice of withholding furnished under paragraph (1) of this subsection;

(4) pay the subcontractor as soon as practicable after the correction of the identified subcontract performance deficiency, and—

(A) make such payment within—

(i) 7 days after correction of the identified subcontract performance deficiency (unless the funds therefor must be recovered from the Government because of a reduction under paragraph (5)(A)); or

(ii) 7 days after the contractor recovers such funds from the Government; or

(B) incur an obligation to pay a late payment interest penalty computed at the rate specified by section 3902(a) of this title;

(5) notify the Government, upon—

(A) reduction of the amount of any subsequent certified application for payment; or

(B) payment to the subcontractor of any withheld amounts of a progress payment, specifying—

(i) the amounts of the progress payments withheld under paragraph (1) of this subsection; and

(ii) the dates that such withholding began and ended; and

(6) be obligated to pay to the Government an amount equal to interest on the withheld payments (computed in the manner provided in section 3903(c) of this title), from the 8th day after receipt of the withheld amounts from the Government until—

(A) the day the identified subcontractor performance deficiency is corrected; or

(B) the date that any subsequent payment is reduced under paragraph (5)(A).

\* \* \* \* \* \*

(g) A written notice of any withholding shall be issued to a subcontractor (with a copy to the Government of any such notice issued by a prime contractor), specifying—

(1) the amount to be withheld;

(2) the specific causes for the withholding under the terms of the subcontract; and

(3) the remedial actions to be taken by the subcontractor in order to receive payment of the amounts withheld.

31 U.S.C. § 3905(e) and (g). Given this wholesale quotation of the Act, the Court wonders how "clear and unambiguous" VBMS really thinks this is. More importantly, it notes that VBMS has not cited anything in either the Act or the record showing that SAMCO did, in fact, fail to abide by these notice provisions, and the Court will not comb through the thicket of exhibits and testimony for it in the hopes of stumbling upon relevant evidence.[8] (*See* Pl.'s Post–Trial Mem. at 2–4.)

8. Indeed, in a stunning commentary on the burden necessary to prove a breach of con-

 Further, the Court believes that the plain language of the Act just as clearly precludes VBMS from proceeding on this alleged violation. Section 3905(i) of the Act provides that:

> [a] *dispute between a contractor and subcontractor relating to the amount or entitlement of a subcontractor to a payment or a late payment interest penalty under a clause included in the subcontract pursuant to subsection (b) or (c) of this section does not constitute a dispute to which the United States is a party.* The United States may not be interpleaded in any judicial or administrative proceeding involving such a dispute.

31 U.S.C. § 3905(i) (emphasis added). Because subcontracts, like the two that VBMS and SAMCO formed, incorporate the provisions of the Act pursuant to "subsection (b)," *see id.* and 31 U.S.C. § 3905(b), and because breach of contract claims under the Miller Act, by definition, make the United States a party to those claims, it follows that VBMS cannot allege a violation of the Act as a "dispute ... relating to the amount or entitlement" VBMS believes it had under its two subcontracts.

Section 3905(j), another provision that VBMS neglects to mention, lends further support to this interpretation. That section states:

> [e]xcept as provided in subsection (i) of this section [which states that contractors cannot make the United States a party to disputes under the Prompt Payment Act] this section shall not limit or impair any contractual, administrative, or judicial remedies otherwise available to a ... subcontractor in the event of a dispute involving a late payment or nonpayment by the prime contractor.

31 U.S.C. § 3905(j). Reading section 3905(i) and section 3905(j) together, the Act indicates again that while contractors can pursue the contractual remedies ordinarily available to them if they do not receive payment, they cannot use the Act as a substantive basis of recovery of that payment when they file their claims pursuant to the Miller Act. This is so because, again, the Miller Act makes the United States the named plaintiff in a breach of contract action against the general contractor. In this Court's view, the Act does nothing dramatic here: it merely leaves in place the principles of contract law that control in Miller Act lawsuits. *See* 31 U.S.C. §§ 3905(i), (j).

The legislative history underlying the Act also favors this conclusion. Congress enacted the Prompt Payment Act to "provide incentives for the Federal Government to pay its bills on time." H.R.REP. No. 461, 97th CONG., 2D Sess. 1, *reprinted in* 1982 U.S.C.C.A.N. 111. According to another report, moreover, the Act's "protections apply only when there is no dispute relating to a contractor's performance in accordance with the terms and conditions of the contract." H.R.REP. NO. 103–884, 103rd CONG., 2D Sess.1995, 1995 WL 5958. And "[i]f a dispute exists, a contractor is not entitled to payment [under the Act] ... until the dispute is resolved." *Id.* Given the plain language of 31 U.S.C. §§ 3905(i) and (j) and the legislative purpose of the Act, and given that SAMCO rightfully contests VBMS's right to payment under its two subcontracts, the Court finds that VBMS has misplaced its reliance on the Act as a basis of recovery.

Lastly, while case law interpreting the Act is scarce, the Court has found no authority supporting VBMS's interpretation of the Act. *E.g., Transamerica Premier Ins. Co. v. Ober,* 894 F.Supp. 471, 479–80 (D.Me.1995) (provisions in Prompt Payment Act requiring general contractor's certification that it had paid subcontractors did not "impose a statutory obligation

---

tract claim, VBMS merely propounds that "[t]here is no evidence that ... SAMCO complied with this [notice] portion of the Act." (Pl.'s Post–Trial Mem. at 4.) The Court still thinks it incumbent upon a plaintiff to prove a breach of contract claim, even if a statute does incorporate or otherwise provide the contract terms at issue.

on [general contractor to] make prompt payment," and only "enable[d] subcontractor to pursue remedies under their subcontract"). And since VBMS has done nothing to show that Congress designed the Act to give subcontractors an additional right of recovery for a general contractor's alleged violation of the Act's notice provisions, nor can this Court interpret the Act as VBMS wishes.

### III. *SUMMARY*

First, the evidence established by a preponderance of the evidence that the plaintiff, VBMS, materially breached both subcontracts it had with the defendant SAMCO. It also proved that SAMCO incurred $5860.75 in costs to cover the work VBMS left undone at the Teton Warehouse project, and another $7374.76 for the work not completed at the Building 721 project. Since this evidence also showed that SAMCO did not actually lose any money in covering this unfinished work, however, SAMCO cannot receive any direct or consequential damages. Therefore, the Court ORDERS VBMS to pay SAMCO only two (2) dollars in nominal damages.

Second, the evidence failed to establish that the parties' Teton Warehouse subcontract either included a time of the essence term, or otherwise made VBMS's timely performance of its subcontract an essential term of their agreement. It also showed that at least one other subcontractor caused substantial delays in completing this project, and that SAMCO did not reasonably apportion the alleged delay damages among VBMS and the other subcontractors. Accordingly, the Court cannot award SAMCO delay damages, either.

Third, the Court finds that SAMCO did nothing to hinder VBMS's performance when it demanded VBMS to perform, and VBMS presented little evidence that could satisfy a cause of action based on SAMCO's alleged failure to coordinate the Teton Warehouse and Building 721 projects.

The Court, therefore, finds this claim meritless.

Lastly, VBMS has also failed to identify any evidence that could prove its claim that SAMCO violated the Prompt Payment Act, the provisions of which its two subcontracts incorporated by operation of law. Further, the Court finds that because neither the plain language of that statute nor its legislative history indicates that the statute creates a cause of action for private litigants involved in a Miller Act dispute, VBMS could not recover damages even if it had attempted to present such evidence.

### *ORDER*

For the reasons stated above, the Court ORDERS that JUDGMENT be entered in favor of the defendants on the plaintiff's complaint and for the defendant SAMCO in the amount of Two Dollars ($2.00) on its counterclaim.