IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

ZUMAR INDUSTRIES, INC., *Plaintiff/Appellee*,

*v.*

CAYMUS CORPORATION, *Defendant/Appellant*.

No. 1 CA-CV 16-0423
FILED 11-16-2017

Appeal from the Superior Court in Maricopa County
No. CV2014-012421
The Honorable James T. Blomo, Judge

**REVERSED AND REMANDED**

COUNSEL

Snell & Wilmer, LLP, Tucson
By Jason Ebe, Andrew M. Jacobs, W. Danny Green
*Counsel for Plaintiff/Appellee*

Miranda Law Firm, Gilbert
By Daniel L. Miranda
*Counsel for Defendant/Appellant*

**OPINION**

Judge Maria Elena Cruz delivered the opinion of the Court, in which Acting
Presiding Judge Peter B. Swann and Judge Michael J. Brown joined.

**C R U Z**, Judge:

¶1          Caymus Corporation ("Caymus") appeals the superior court's (1) grant of summary judgment in favor of Zumar Industries, Inc. ("Zumar") and (2) denial of its motion to add counterclaims. Because we hold the court incorrectly applied the Arizona Prompt Pay Act ("Act") to a contractor-subcontractor dispute on a federal work project, we reverse and remand for proceedings consistent with this decision.

## FACTUAL AND PROCEDURAL HISTORY[1]

¶2          The National Park Service ("NPS") is a bureau of the U.S. Department of the Interior, a federal agency. In 2013, NPS hired Caymus to provide and install road signs at Grand Canyon National Park. The contract price was $292,300. Caymus was prepared to bond the project, but NPS's representative told Caymus a bond was not required because the contract was a service contract, not a construction contract. Caymus hired Zumar, a supplier of traffic signs and related highway safety products with offices in Arizona, California, and Washington, to supply the sign panels. Zumar quoted $92,793.60 for the job; Caymus accepted the quote and agreed to Zumar's credit application, which provided that Caymus would pay according to the terms of sale stated on Zumar's invoices.

¶3          In March 2014, Zumar delivered sign panels to the job site; NPS raised immediate concerns about defective and missing panels. Thereafter, the parties and NPS had ongoing discussions regarding completion of the sign panels work. On June 30, though, Caymus submitted a pay application to NPS, certifying the sign panels line item was 100% completed. In total, Caymus requested and received $98,800 from NPS for the sign panels scope of work.

¶4          Zumar invoiced Caymus in full for the sign panels. Caymus paid Zumar $59,278.10, but withheld $35,632.33 pending Zumar's

---

[1]          We view the facts and inferences drawn therefrom in the light most favorable to Caymus, the party against which summary judgment was entered. *Weitz Co. L.L.C. v. Heth*, 235 Ariz. 405, 408, ¶ 2 (2014).

satisfactory performance.[2]  To resolve the parties' dispute, in October 2014, Zumar's counsel proposed the following:

> Although Caymus has not facilitated a discussion with NPS to attempt to resolve this matter, NPS has contacted Zumar, and proposed to release payment through Caymus to Zumar of the principal amount of $30,632.33 now, with the final principal amount of $5,000.00 to be paid by NPS through Caymus to Zumar upon Zumar's completion of the items on the enclosed punch list.  This proposed resolution is acceptable to Zumar, and we understand NPS has or will contact you to seek your consent.  Of course, both payments need to be by joint check, executed first by Caymus, to ensure that Zumar actually receives payment as intended by NPS.

To this end, Bryan Gregory, a contracting officer with NPS, asked Randy Ringleb, Caymus' president:

> Can you provide the status of payments to Zumar? Zumar has expressed a desire to perform needed repairs, but had concerns about payment.  Understandably, there may be some amount that is withheld until completion.  However, I would encourage you to continue to work with Zumar to get things wrapped up, particularly since we are so near.  If you have not already made plans for an interim payment, you may consider doing so to keep things moving in a positive direction.  The Government has withheld less than 10% of the contract value. Perhaps you could take a similar approach?

Caymus would not agree to the proposal absent agreement by Zumar to warranty the sign panels or assurance from NPS that it would accept them in as-is condition.

---

[2]     Zumar's quote was $92,793.60 and it later sought $35,632.33 in unpaid invoices.  Caymus claims it paid Zumar $50,000 and Zumar and Caymus both acknowledge that Zumar also applied a separate 10% deposit of $9,278.10 towards the balance.  Incorporating that 10% deposit, Zumar would have been paid $59,278.10 to date.  Given Zumar's claim of $35,632.33 owing, Zumar's resulting receipts would total $94,910.43; $2,116.83 more than its original quote for the job.  We note this potential discrepancy for the superior court's consideration on remand.

¶5        In December 2014, NPS submitted to Zumar and Caymus a punch list of items required to complete the sign panels work. Several months later, NPS sent a Cure Notice, alleging that twenty-two sign panels needed repair and three were missing. Caymus completed the work at a cost of $15,000. NPS withheld final payment to Caymus of $35,367.96 pending resolution of a dispute based in part on the sign panels.

¶6        In the meantime, in September 2014, Zumar brought this breach of contract action against Caymus, seeking damages of $35,632.33. The matter proceeded to compulsory arbitration. Zumar prevailed, and Caymus appealed. Zumar moved for summary judgment, arguing Caymus violated state and federal prompt pay laws, which constituted a material breach of the subcontract. The superior court agreed and granted the motion. While the motion was pending, Caymus moved to add counterclaims for breach of contract, breach of warranty, and (in the alternative) unjust enrichment. The court denied that motion and Caymus' subsequent motion for reconsideration. The court entered a final judgment and Caymus timely appealed. We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") section 12-2101(A)(1).

## DISCUSSION

I.    Motion for Summary Judgment

¶7        Summary judgment is appropriate where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Johnson v. Earnhardt's Gilbert Dodge, Inc.*, 212 Ariz. 381, 385, ¶ 15 (2006). A motion for summary judgment should be granted "if the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *Orme Sch. v. Reeves*, 166 Ariz. 301, 309 (1990); *see* Ariz. R. Civ. P. 56(a). We review whether summary judgment was proper based on the record made in the superior court, "but we determine *de novo* whether the entry of judgment was proper." *Schwab v. Ames Constr.*, 207 Ariz. 56, 60, ¶ 17 (App. 2004).

      A.    Arizona Prompt Pay Act

¶8        Caymus argues Zumar failed to establish it was entitled to judgment as a matter of law based on Caymus' alleged violation of the Act. *See* A.R.S. § 32-1129 through -1129.07. We agree.

4

¶9          "[T]he primary purpose of the Act is to establish a framework for ensuring timely payments from the owner to the contractor and down the line to the subcontractors and suppliers whose work has been approved." *Stonecreek Bldg. Co., Inc. v. Shure*, 216 Ariz. 36, 39, ¶ 16 (App. 2007). Caymus argues the Act does not apply to agencies of the federal government, as they cannot be "owners" under the Act. Zumar argues the prompt pay provisions of the Act do not hinge upon the identity of the owner of the project, that the provisions apply to agreements between a contractor and subcontractor in any context, and the Act does not offend federal supremacy because it does not regulate, compel, or otherwise apply to the federal government.

¶10          We review *de novo* issues of statutory interpretation and application. *Obregon v. Indus. Comm'n*, 217 Ariz. 612, 614, ¶ 9 (App. 2008). We give words in statutes their commonly accepted meaning unless the legislature has clearly expressed an intent to give a term a different meaning. *Id.* at ¶ 11. We construe a statute in context with other related provisions and its place in the statutory scheme. *State v. Flynt*, 199 Ariz. 92, 94, ¶ 5 (App. 2000).

¶11          The Act's payment scheme does not apply to this federal project, and its provisions cannot be read into the contract dispute. Although Zumar does not suggest NPS is an "owner" under the Act, *see* A.R.S. § 32-1129(A)(4),[3] Zumar contends § 32-1129.02 regulates payment from a contractor to a subcontractor or material supplier *in any context*, even on a federal project.[4] It does not. The Act links progress payments from

---

[3]      Section 32-1129(A)(4) provides:

> "Owner" means any person, firm, partnership, corporation, association or other organization, or a combination of any of them, that causes a building, structure or improvement to be constructed, altered, repaired, maintained, moved or demolished or that causes land to be excavated or otherwise developed or improved, whether the interest or estate of the person is in fee, as vendee under a contract to purchase, as lessee or another interest or estate less than fee.

A.R.S. § 32-1129(A)(4)

[4]      Section 32-1129.02 provides, in relevant part:

owner to contractor, *see* A.R.S. § 32-1129.01, and from contractor to subcontractor or supplier, *see* A.R.S. § 32-1129.02. *Stonecreek*, 216 Ariz. at 39, ¶ 16. Caymus is a "contractor" under § 32-1129.02 only in relation to "a direct contract with *an owner* to perform work under a construction contract." A.R.S. § 32-1129(A)(2) (emphasis added). Zumar is a "subcontractor" under § 32-1129.02 only in relation to a "direct contract with a contractor . . . to perform a portion of the work under a construction contract." A.R.S. § 32-1129(A)(6). The Act is framed around the central concept of "owner," as defined by the Act, and the flow of payments from owner to contractor and down the line; contractor-subcontractor disputes cannot be solely separated from that framework.

**¶12**        Section 32-1129(A)(4) lists the entities included in the definition of owner: person; firm; partnership; corporation; association or other organization; or any combination of those previously listed. A.R.S. § 32-1129(A)(4). Absent from the definition is any form of government, government agency, or political subdivision. Zumar asks this Court to find the Act applies in any context; regardless of the owner. Not only is "owner" integral to the statutory definition of "contractor," and therefore to "construction contract," it is integral to the central purpose of the Act. The Act requires progress payments from the owner to contractor, A.R.S. § 32-1129.01, subjects the contractual rights of the owner regarding withholding

---

A. *Notwithstanding the other provisions of this article*, performance by a contractor, subcontractor or material supplier in accordance with the provisions of a construction contract entitles the contractor, subcontractor or material supplier to payment from the party with whom the contractor, subcontractor or material supplier contracts.

B. If a subcontractor or material supplier has performed in accordance with the provisions of a construction contract, the contractor shall pay to its subcontractors or material suppliers and each subcontractor shall pay to its subcontractors or material suppliers, within seven days of receipt by the contractor or subcontractor of each progress payment, retention release or final payment, the full amount received for such subcontractor's work and materials supplied based on work completed or materials supplied under the subcontract.

A.R.S. § 32-1129.02 (Emphasis added.)

payment to the provisions of the Act, A.R.S. § 32-1129.02(G), and grants to contractors and subcontractors termination rights against an owner, A.R.S. § 32-1129.04. Contractor and subcontractor rights and responsibilities under the Act depend upon the contractual relationship between the owner and contractor. Section 32-1129(A) not only fails to include any government or governmental unit in the definition of "owner," the Act's subsections placing contractual obligations upon owners and granting rights to contractors and subcontractors against owners cannot be understood to apply to the federal government or any of its agencies. *Cf. Elec. Constr. Co. v. Flickinger*, 107 Ariz. 222, 224 (1971) (holding "Arizona's contractor's licensing act has no application to subcontractors engaged in the performance of duties for the benefit of the United States.").

¶13 Zumar argues § 32-1129.02(A)(1) applies "notwithstanding other provisions" of the Act. This language is commonly understood to mean a particular provision will trump any conflicting statutes. *See City of Phx. v. Glenayre Elecs., Inc.*, 242 Ariz. 139, 144, ¶¶ 16-18 (2017) (discussing phrase "notwithstanding any other statute" in context of statute of repose). However, the phrase "notwithstanding other provisions" does not permit interpretations that conflict with a statute's own defined terms.

¶14 The Act prescribes that the above-listed defined terms apply throughout §§ 32-1129.01 to -1129.05, and -1129.07. A.R.S. § 32-1129(A). "When a statutory scheme expressly defines certain terms, we are bound by those definitions in construing a statute within that scheme." *State v. Wilson*, 200 Ariz. 390, 397, ¶ 20 (App. 2001). Section 32-1129.02(A)(1) contains the terms "contractor," "subcontractor," and "construction contract"—defined terms with significance to the Act's central framework linking prompt payments from owner to contractor and down the line. Reading the provision as Zumar wishes would gut the Act of its central framework and purpose. If we applied Zumar's reading of "notwithstanding"—finding the provision allowed subcontractor-contractor suits regardless of the existence of an owner as defined—we would not only divest those defined terms in § 32-1129.02(A)(1) of their intended meaning prescribed by the legislature, but would necessarily interpret § 32-1129.02(A)(1) to apply to contracts involving the state government and its political subdivisions, which is expressly prohibited in § 32-1129.06.

**¶15** We find Zumar's proposed reading of "notwithstanding other provisions" in contradiction with the Act's own language and its central framework.[5]

**¶16** This decision does not leave subcontractors without a remedy, see *Stonecreek*, 216 Ariz. at 40, ¶ 18; we simply hold that "owner" does not include the federal government or its agencies, and thus hold the Act inapplicable when the contract at issue is a federal work project.

### B. Federal Prompt Pay Act

**¶17** Caymus argues that Zumar failed to establish it was entitled to judgment as a matter of law based on Caymus' alleged violation of the Federal Prompt Pay Act ("FPPA"). *See* 31 U.S.C. §§ 3901-05. For the following reasons, we agree.

### 1. Construction Contract

**¶18** "The FPPA mandates that government construction contracts must include a clause that requires the general contractor to pay subcontractors for satisfactory performance within seven days of receipt of payment from the federal agency."[6] *W & W Steel, LLC v. BSC Steel, Inc.*, 944 F. Supp. 2d 1066, 1080 (D. Kan. 2013); *see* 31 U.S.C. § 3905(b)(1).

---

[5] We do not base our decision on any preemptive conflict between the Federal Prompt Pay Act and the Arizona Act, see *U.S. ex rel. Cal's A/C & Elec. v. Famous Constr. Corp.*, 34 F. Supp. 2d 1042 (W.D. La. 1999), and note the Federal Act does not otherwise limit or impair any administrative, judicial, or contractual remedies available to a contractor or subcontractor in the event of a dispute, 31 U.S.C. § 3905(j).

[6] One commentator has observed:

[An] important difference *between Government construction contracts and other types of contracts for supplies and services*, is that 31 U.S.C. § 3905(b) requires construction contractors to insert in each first-tier subcontract for property or services, a provision requiring the contractor to pay their subcontractors for satisfactory performance no later than seven days after receipt of payment from the Government. Additionally, this subcontract clause must provide for the payment of an interest penalty for each payment not made in

¶19      Zumar has not met its burden to show the prime contract between NPS and Caymus was a "construction contract" subject to the FPPA. *See Nat'l Bank of Ariz. v. Thruston*, 218 Ariz. 112, 115-19, ¶¶ 16-29 (App. 2008) (stating conclusory statements will not suffice, but that the movant must point to relevant evidentiary materials). Zumar contended the supply and installation of road signs constituted "construction," but this contention was not supported by analysis or citation to authority. Caymus did not provide a performance or payment bond, which is required by the Miller Act on a construction contract of $100,000 or more.[7] *See generally* 40 U.S.C. §§ 3131-3134. NPS did not require a bond because it considered the contract to be a service contract, and the Federal Acquisition Regulation requirement governing a construction project was not included in the Caymus contract. To this end, Zumar suggests a federal agency cannot determine the proper classification of *its own* contracts, but it has not offered analysis or authority to support this broad (and seemingly incorrect) conclusion. Zumar's principal and owner, Mark Giese, described the work only as "a project Caymus was constructing . . . ." Because Zumar failed to show the scope of the prime contract was "construction," it was not entitled to summary judgment on this basis.

### 2. Private Right of Action

¶20      The FPPA does not impair contractual remedies "otherwise available" to a subcontractor (including a material supplier) in a payment dispute. 31 U.S.C. § 3905(b), (j). It cannot be used, however, as a substantive

---

accordance with this clause. 31 U.S.C. § 3905(c) further requires that each subcontract include a similar clause in their subcontracts with lower-tier subcontractors and material suppliers. [Federal Acquisition Regulation] 52.232-27(b) implements the subcontract prompt payment procedures in 31 U.S.C. § 3905(b) and in most respects mirrors the statutory language.

Brian A. Darst and Lee P. Curtis, *Government Construction Contracting*, at *4-49 (Fed. Publ'ns LLC 2007) (emphasis added).

[7]     "The [Miller] Act was designed as an alternative remedy to the mechanic's lien available in ordinary private construction disputes because a lien cannot attach to government property." *U.S. for Use & Benefit of Conveyor Rental & Sales Co. v. Aetna Cas. & Sur. Co.*, 981 F.2d 448, 450 (9th Cir. 1992).

basis of recovery. It is well settled that the FPPA does not contain an explicit or implied private cause of action in favor of an unpaid subcontractor. *W & W Steel*, 944 F. Supp. 2d at 1080; *U.S. ex rel. IES Commercial, Inc. v. Cont'l Ins. Co., Inc.*, 814 F. Supp. 2d 1, 3 (D.D.C. 2011) ("[T]he apparently unanimous conclusion that the [FPPA] does not create a private right of action is nonetheless persuasive."). Although a subcontractor may sue for breach of contract under state law, see 31 U.S.C. § 3905(j), it may not base the claim on alleged violations of provisions read into the subcontract by operation of the FPPA. *See W & W Steel*, 944 F. Supp. 2d at 1080-81 (rejecting suit against contractor based on argument that provisions of FPPA are read into subcontract by operation of law); *see also U.S. ex rel. Va. Beach Mech. Servs., Inc. v. SAMCO Constr. Co.*, 39 F. Supp. 2d 661, 675-78 (E.D. Va. 1999); *Transamerica Premier Ins. Co. v. Ober*, 894 F. Supp. 471, 480 (D. Me. 1995) ("All contracts, by definition, between the prime contractor and subcontractors already include a promise to pay the subcontractor; the statute merely imposes certain characteristics on the promise.").

**¶21**      As we have recognized in connection with Arizona's Act, a prompt pay violation does not relieve a subcontractor from responsibility for poor or inadequate performance. In that context, the remedies for an untimely payment are interest penalties and the threat of action by the registrar of contractors. A.R.S. § 32-1129.02(B), (I). "Certification of payment given during the course of construction is not regarded as conclusive that the work was properly performed." *Stonecreek*, 216 Ariz. at 40, ¶ 18 (discussing availability of civil remedies in an action under the Act).

**¶22**      Accordingly, because Zumar did not demonstrate it was entitled to judgment as a matter of law, the superior court erred in granting summary judgment on this basis.

### C. Breach of Contract

**¶23**      In its answering brief, Zumar argues the entry of summary judgment was proper in any event because there are no material disputes of fact regarding Caymus' failure to pay per Zumar's "Net 30" invoices. Zumar did not raise this argument in the superior court, and we will not address it for the first time on appeal. *See Airfreight Express Ltd. v. Evergreen Air Ctr., Inc.*, 215 Ariz. 103, 109-10, ¶ 17 (App. 2007).

## II.     Motion to Add Counterclaims

**¶24**      Caymus argues the superior court erred in denying its motion to add counterclaims. We review the denial of a motion to amend a pleading for an abuse of discretion. *Alosi v. Hewitt*, 229 Ariz. 449, 452, ¶ 13

(App. 2012). In so doing, we presume the truth of the facts alleged in the amended pleading. *MacCollum v. Perkinson*, 185 Ariz. 179, 185 (App. 1996). "Leave to amend is discretionary, but is liberally granted." *Id.*

**¶25** On appeal, Zumar argues the counterclaims are barred under Arizona Rule of Civil Procedure 13(e). However, Zumar did not raise this issue in the superior court, and we decline to consider it now. *See Airfreight Express Ltd.*, 215 Ariz. at 109, ¶ 17. In the superior court, Zumar argued only that the amendment would be futile, explaining Caymus' violation of prompt pay laws constituted a material breach of contract that excused Zumar from further performance. *See Zancanaro v. Cross*, 85 Ariz. 394, 400 (1959). "A court does not abuse its discretion in denying a motion for leave to amend if the amendment would be futile." *ELM Ret. Ctr., LP v. Callaway*, 226 Ariz. 287, 292, ¶ 26 (App. 2010). However, because we reverse the superior court on the statutory bases underlying its summary judgment ruling, we similarly reverse its finding of futility.

## CONCLUSION

**¶26** For the foregoing reasons, we reverse and remand for proceedings consistent with this opinion. Caymus requests its attorneys' fees and costs on appeal pursuant to A.R.S. §§ 12-341.01, -341. In the exercise of our discretion, we award Caymus its costs and reasonable attorneys' fees pursuant to Arizona Rule of Civil Appellate Procedure 21.

